S03P1825. LEWIS v. THE STATE.
(592 SE2d 405)

BENHAM, Justice.

Having found Christopher Kirkprock Lewis guilty of malice murder, felony murder, aggravated battery, burglary, and possession of a knife during the commission of a felony, the jury recommended a death sentence for the malice murder conviction, finding beyond a reasonable doubt three statutory aggravating circumstances to support its verdict of death: the murder was committed while Lewis was engaged in the commission of an aggravated battery; the murder was committed while Lewis was engaged in the commission of a burglary; and the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, and an aggravated battery to the victim before death. OCGA § 17-10-30 (b) (2), (7). On direct appeal from that sentence, we addressed only issues involving Lewis's motion for new trial, reversing the denial of that motion and remanding for another motion for new trial hearing before a different judge. *Lewis v. State*, 275 Ga. 194 (565 SE2d 437) (2002). After that mandated hearing was conducted, the trial court denied Lewis's motion for new trial. Lewis appeals, and we affirm.[1]

---

[1] Lewis committed the crimes on December 20, 1996. The grand jury indicted Lewis on October 22, 1997, for malice murder, felony murder (two counts), aggravated battery, burglary (two counts), and possession of a knife during the commission of a felony. The State filed its notice of intent to seek the death penalty on October 23, 1997. The trial took place November 9-14, 1998. The jury convicted Lewis on all counts on November 13 and recommended the death penalty on November 14. In addition to the death penalty, the trial court sentenced Lewis to consecutive sentences of twenty years for burglary, twenty years for aggravated battery, and five years for possession of a knife during the commission of a felony. The felony murder convictions were vacated by operation of law (*Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993)) and the remaining convictions merged with other convictions. After this Court remanded for a new motion for new trial hearing, that hearing was

1. The evidence adduced at trial showed that Lewis and the victim, Cheryl Lewis, were married in 1992. Cheryl had two children from a previous marriage, Kellee and Sean, who were 13 and 10 years old respectively when their mother was killed. In 1995, Lewis and Cheryl began living apart and there were several incidents of domestic violence over the following year. During an altercation in March 1996, Lewis threatened Cheryl in the presence of a police officer, saying that it would be "this O.J. Simpson situation again" when he got out of jail. During another altercation in August 1996, Cheryl told Lewis that she wanted a divorce and Lewis argued against it. Starting in October 1996, Lewis often appeared at Cheryl's apartment to bang on her door; he would also sit and watch her door for several hours at a time. In November, Cheryl and her children moved to another apartment, but Lewis's behavior continued. On December 19, 1996, Cheryl went to a Christmas party with a co-worker, Robbie Epps. The children remained in the apartment watching television. At approximately 11:00 p.m., Lewis began banging on Cheryl's apartment door, cursing and yelling, "[O]pen up the door, I know you're in there." The children did not open the door because their mother had instructed them not to open it. Eventually, the banging ceased and they went to sleep.

At 1:45 a.m., Kellee was awakened by her mother screaming. She went to her mother's bedroom and saw Lewis on top of Cheryl holding a knife. Kellee could not find the cellular phone so she ran next door to call the police, telling the neighbor, "[I]t's my step daddy, he's killing my mama." Sean testified that he also was awakened by his mother's screams. He pretended to be asleep and saw Lewis enter his bedroom, look through the blinds, and then run out of the room. The police arrived and found Robbie Epps, clad only in boxer shorts despite the frigid weather, standing in the parking lot. Epps looked scared and said there was a man in the apartment. The medical examiner testified that Cheryl had suffered 42 injuries, including 17-20 stab or cut wounds to the neck. She bled to death because her carotid artery and jugular vein had been severed. There was a bloody eight-inch serrated knife found at the scene that was consistent with the murder weapon. The police determined that the assailant had entered the apartment through a kitchen window after prying the window lock and fled through the rear sliding glass door after the attack. They went to Lewis's apartment complex and arrested him in the parking lot. He told them he knew they would catch up to him. They found a 12-inch butcher knife hidden in his right sleeve. DNA

held on December 17, 2002, and the motion for new trial was denied on January 9, 2003. Lewis filed his notice of appeal on February 7, 2003, and this case was docketed on August 21, 2003. The appeal was submitted for decision after oral argument on November 17, 2003.

taken from bloodstains on his shoe and sweat pants matched the DNA profile of Cheryl Lewis.

The evidence was sufficient to enable a rational trier of fact to find proof beyond a reasonable doubt of Lewis's guilt of malice murder, felony murder, burglary, aggravated battery, and possession of a knife during the commission of a felony. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find beyond a reasonable doubt the statutory aggravating circumstances which supported his death sentence for the murder. *Jackson v. Virginia*, supra; OCGA § 17-10-35 (c) (2).

2. Lewis claims that the trial court erred by refusing to grant a mistrial after the State made religious references in its penalty-phase closing argument. See *Carruthers v. State*, 272 Ga. 306, 308-311 (2) (528 SE2d 217) (2000). In his closing argument in the penalty phase, the prosecutor argued the following:

> Now, ladies and gentlemen, let me talk to you. There are many of you who are Christians and what I say to you does not in any way suggest to you that any religious materials demand the death penalty at all, instead I think that it helps us understand the concept of deterrence and retribution and for this I speak to you. Romans tells us that every person is subject to the governing authorities. And in fact in [Matthew] it says, who so sheddeth man's blood by man shall his blood be shed.

Lewis's counsel objected that the prosecutor was trying to inject biblical law into the case, and moved for a mistrial. In a bench discussion outside the hearing of the jury, the prosecutor cited cases which held that while a prosecutor cannot urge the imposition of the death penalty based upon religious beliefs or teachings, he can " 'allude to such principles of divine law relating to [the] transactions of men as may be appropriate to the case.' " *Hill v. State*, 263 Ga. 37, 45-46 (19) (427 SE2d 770) (1993). See also *Crowe v. State*, 265 Ga. 582, 593 (18) (d) (458 SE2d 799) (1995). However, the trial court sustained Lewis's objection in part, told the prosecutor not to "read passages" from the Bible, and instructed the jury:

> Ladies and gentlemen of the jury, to some extent I have sustained the defendant's objection in that counsel for the State may [allude] to divine law without presenting it as something to be followed as the state law that I will give you. . . . However, those matters read to you by [the prosecutor] from the Bible are to be disregarded by you and not be used by you in any fashion in determining your decision in

that regard. I will give you the charge from the court, the law that you're to apply in this case. You are not to use what he read to you in any form or fashion in reaching and determining your verdict as it relates to the sentencing in this case. Is there any juror who does not understand that instruction? If so, please raise your hand.

No jurors raised their hands. The trial court then asked, "Is there any juror who is unwilling to follow this instruction or feels that they cannot follow this instruction? If so, raise your hand." No jurors raised their hands. The prosecutor then continued with his closing argument without making another religious reference.

After the conclusion of Lewis's trial, this Court held a similar argument by the same prosecutor in another death penalty case to be reversible error as to the death sentence. *Carruthers*, supra.[2] We determined that the argument in that case was reversible error because it injected the irrelevant and often inflammatory issue of religion into the sentencing process and improperly appealed to the jurors' religious beliefs in deciding whether a defendant should live or die. See id. at 309. The prosecutor's use of language of command and obligation derived from religious authority also diminished the jury's sense of responsibility for their sentencing decision and implied that they should base their decision on a different, higher law than that of the state of Georgia. Id.

We conclude, however, that the prosecutor's argument in this case, although improper, does not require the reversal of the death sentence. The trial court issued lengthy curative instructions to the jury, informing them that Lewis's objection had been sustained in part, demanding that the prosecutor's argument be completely disregarded, and charging them that the law that they would use to decide Lewis's sentence would come only from the trial court. The trial court asked the jurors to indicate whether any of them did not understand or could not follow her curative instructions, and none responded. By contrast, the trial court in *Carruthers*, which had overruled the defendant's objections to the biblical passages, did not issue any curative instructions. Under the circumstances in this case, we believe

---

[2] The prosecutor argued in *Carruthers*:

Now, ladies and gentlemen, let me talk to you a moment about some biblical references that help us in this case. Deterrence is very important and the Bible suggests to us why deterrence is appropriate. Romans tells us that every person is subject to the governing authority, every person is subject. And in Matthew it tells us, who sheddeth man's blood by man shall his blood be shed for in the image of God made [he] man. For all they who take the sword shall die by the sword, and this is a message that is very clear, that society must deter criminals.

(Footnote omitted.) *Carruthers*, supra at 308 (2).

the extensive curative instructions were sufficient to cure the harm from the prosecutor's brief religion-based argument. See *Mobley v. State*, 265 Ga. 292, 300 (19) (455 SE2d 61) (1995); *Hill*, supra at 43-44 (12). The trial court did not err by denying Lewis's motion for a mistrial.

3. Lewis claims that there was an improper communication between the jury and either the judge or an unspecified person during deliberations. See, e.g., *Hanifa v. State*, 269 Ga. 797, 806-808 (6) (505 SE2d 731) (1998); *Turpin v. Todd*, 268 Ga. 820, 822 (1) (b) (493 SE2d 900) (1997). He bases this claim on the testimony of two trial jurors at the motion for new trial hearing that one and possibly two notes had been sent out of the jury room during deliberations and that written responses were received by the jury. No jury notes appear in the trial record. Juror Wright could not remember what questions were on the notes or if there were one or two notes. She believed that the note or notes were sent out during penalty phase deliberations, and that one note may have dealt with a request for the physical evidence to be sent in so they could begin deliberations. Juror Watson remembered two notes: one asking for a break and one asking for the definition of "malice." She believed that the malice note may have been sent out during the guilt-innocence phase deliberations but she was unsure. Both jurors testified that they never actually saw what was written on the note or notes because the jury foreman did the writing.

The trial judge testified that she received no notes from the jury about the substance of the case during the trial, although she may have received a written request for a break.[3] She averred that she always turns over substantive jury notes to the court reporter for inclusion in the record and, if a note dealt with anything like the definition of malice, she would have convened the litigants for a hearing on the matter.

After the judge hearing the post-remand motion for new trial reopened the evidence, the bailiff testified that he did not remember any notes during Lewis's trial, but that he always took jury notes immediately to the judge and he always returned her written responses to the jury. The jury foreman testified that he communicated to the judge from the jury room only three times: to ask for lunch to be sent in, to ask that the physical evidence be brought in so they could begin deliberating, and to tell the judge they had reached a verdict. There were no other communications, he stated, and the jury never asked for any re-charges or legal definitions. He testified

---

[3] The transcript reflects discussion about only one note to the trial court from a juror. This note was received before guilt-innocence phase closing arguments and requested the opportunity to make a phone call home.

that all the communications were oral except for a note he wrote dealing with requested lunch items because "we had specific items ordered." That note was returned with the requested lunch items. He remembered the jury discussion about the definition of malice and was in fact the juror confused about that definition, but he sent out no notes about it.

We conclude the motion-for-new-trial court did not err by finding no improper communication with the jury during the trial. "The trial court's findings of fact on motion for new trial are upheld unless clearly erroneous." *Peralta v. State*, 276 Ga. 218, 219 (2) (576 SE2d 853) (2003). The hearing court's findings on the purported jury communications were supported by the evidence presented at the post-trial hearings, and the hearing court did not err in crediting the testimony of the trial judge, the bailiff, and the jury foreman who actually wrote the note, over the vague and confused recollection of the two trial jurors. See id. at 219-220. It was also not improper for the motion-for-new-trial court to re-open the evidence to hear additional testimony on this matter. See *Carruth v. State*, 267 Ga. 221 (476 SE2d 739) (1996); *Carter v. State*, 263 Ga. 401, 402 (2) (435 SE2d 42) (1993). We find no error in the denial of Lewis's motion for new trial. *Young v. State*, 269 Ga. 490, 491-492 (2) (500 SE2d 583) (1998) ("A trial court's denial of a motion for new trial will not be reversed unless it affirmatively appears that the court abused its discretion.").

4. Lewis's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). Lewis harassed his estranged wife; broke into her apartment through a window; and stabbed and slashed her over 40 times while her children were present in the apartment. The similar cases listed in the Appendix support the imposition of the death penalty in this case, in that all involve a murder during the commission of a burglary or an aggravated battery or the finding of the OCGA § 17-10-30 (b) (7) aggravating circumstance.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002); *McPherson v. State*, 274 Ga. 444 (553 SE2d 569) (2001); *Gissendaner v. State*, 272 Ga. 704 (532 SE2d 677) (2000); *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000); *Gulley v. State*, 271 Ga. 337 (519 SE2d 655) (1999); *Palmer v. State*, 271 Ga. 234 (517 SE2d 502) (1999); *Pruitt v. State*, 270 Ga. 745 (514 SE2d

639) (1999); *Perkins v. State*, 269 Ga. 791 (505 SE2d 16) (1998); *Pye v. State*, 269 Ga. 779 (505 SE2d 4) (1998); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *McMichen v. State*, 265 Ga. 598 (458 SE2d 833) (1995); *Ledford v. State*, 264 Ga. 60 (439 SE2d 917) (1994); *Fugate v. State*, 263 Ga. 260 (431 SE2d 104) (1993); *Tharpe v. State*, 262 Ga. 110 (416 SE2d 78) (1992); *Lynd v. State*, 262 Ga. 58 (414 SE2d 5) (1992); *Hall v. State*, 259 Ga. 412 (383 SE2d 128) (1989); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Childs v. State*, 257 Ga. 243 (357 SE2d 48) (1987).

DECIDED JANUARY 20, 2004.

*Thomas M. Martin*, for appellant.

*Robert E. Keller, District Attorney, Todd E. Naugle, Assistant District Attorney, Thurbert E. Baker, Attorney General, Karen A. Johnson, Assistant Attorney General*, for appellee.