### S09A1862. HALL v. LEWIS.
(692 SE2d 580)

CARLEY, Presiding Justice.

In 1998, Christopher K. Lewis was convicted of malice murder, felony murder, aggravated battery, burglary, and possession of a knife during the commission of a felony, and he was sentenced to death for the murder. After reversing and remanding for a new hearing on Lewis' motion for new trial, *Lewis v. State*, 275 Ga. 194 (565 SE2d 437) (2002), this Court unanimously affirmed Lewis' convictions and death sentence in 2004. *Lewis v. State*, 277 Ga. 534 (592 SE2d 405) (2004). In that same year, Lewis filed a pro se petition for writ of habeas corpus. After obtaining the assistance of pro bono counsel, Lewis amended his petition in 2007, and an evidentiary hearing was held on March 3 and 4, 2008. In its final order of June 10, 2009, the habeas court found that trial counsel were ineffective at both phases of trial, that appellate counsel was ineffective in failing to raise on direct appeal trial counsel's ineffectiveness, and that Lewis is mentally retarded and, therefore, is ineligible for the death penalty.

Accordingly, the habeas court granted habeas relief with respect to Lewis' malice murder conviction and death sentence. The Warden appeals only the habeas court's grant of relief as to Lewis' malice murder conviction. For the reasons set forth below, we reverse in part and remand in part.

*I. Factual Background*

The evidence adduced at trial showed the following. Lewis and the victim, Cheryl Lewis, were married in 1992 but began living apart in 1995. There were several incidents of domestic violence over the following year. On the evening of December 19, 1996, Ms. Lewis went to a Christmas party with a co-worker, Robbie Epps. Ms. Lewis' roommate left for work shortly before 10:30 p.m., leaving Ms. Lewis' two children, Kellee and Sean Dunn, alone in the apartment. Shortly afterward, Lewis began banging on Ms. Lewis' apartment door, cursing and demanding to be let in. Ms. Lewis had instructed 13-year-old Kellee and 10-year-old Sean not to let Lewis in, and the children did not go to the door. They remained in an upstairs bedroom, where they were watching television with the lights turned out. Eventually, the banging ceased, and the children fell asleep.

At about 1:45 a.m., Kellee was awakened by her mother's screams. Seeing the light on in the bedroom across the hall, Kellee went there and attempted to push open the door. She was able to get her head far enough into the room to see her mother on the floor and Lewis kneeling over her with a knife in his hand. Lewis ordered Kellee out of the room and forced the door shut behind her. After failing to locate the cellular telephone in either of the two other bedrooms, Kellee ran downstairs and next door to call the police. Sean, who also heard his mother screaming, pretended to be asleep and saw Lewis enter his bedroom, look through the blinds, and then run out of the room. When the responding police officer arrived, he found Epps standing in the parking lot. Epps appeared frightened and intoxicated and said that there was a man in the apartment. Ms. Lewis, who had suffered 42 injuries that included 17 to 20 stab or cut wounds to the neck, had bled to death from her severed carotid artery and jugular vein. An eight-inch serrated knife found underneath her body was consistent with the murder weapon.

Kellee identified Lewis as her mother's attacker. After determining Lewis' address by tracing the telephone number from which Lewis had paged the victim earlier that evening, police went to Lewis' apartment complex and arrested him in the parking lot. A 12-inch butcher knife was found hidden in Lewis' right sleeve, and DNA taken from bloodstains on his shoe and sweat pants matched the DNA profile of Cheryl Lewis.

*II. Alleged Ineffective Assistance of Counsel*

The habeas court vacated Lewis' malice murder conviction based

upon its conclusion that Lewis' appellate counsel was constitutionally deficient in failing to raise on direct appeal trial counsel's ineffectiveness in failing to conduct a reasonable investigation before deciding on a "fanciful and wholly unsupported theory of actual innocence." The habeas court further found that, had trial counsel "instead presented a voluntary manslaughter defense as the evidence supported, there is a reasonable likelihood that the jury would have opted for a voluntary manslaughter verdict."

A. *Standard of review.* At trial Lewis was represented by David Walker, who acted as lead counsel, and Leon Hicks, who served as co-counsel. After Lewis' trial, the trial court discharged Walker and Hicks and appointed new counsel to represent Lewis in postconviction proceedings. Thus, Lewis' claim of ineffective assistance of trial counsel could have been raised in his motion for new trial and on direct appeal and, accordingly, it is barred as procedurally defaulted, at least as an independent claim. See *Head v. Ferrell*, 274 Ga. 399, 401 (III) (554 SE2d 155) (2001); OCGA § 9-14-48 (d).

However, a habeas petitioner may overcome the bar to procedurally defaulted claims by satisfying the "cause and prejudice" test. *Waldrip v. Head*, 279 Ga. 826, 832 (II) (H) (620 SE2d 829) (2005).

> [T]his Court has held that ineffective assistance of counsel in waiving an issue at trial or omitting an issue on appeal can . . . satisfy the "cause" requirement of the "cause and prejudice" test. [Cit.] This Court has further held that a petitioner who has shown sufficient "prejudice" under *Strickland v. Washington,* 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), to support a claim of ineffective assistance of counsel in waiving a claim at trial or omitting a claim on appeal has also shown sufficient "prejudice" under the "cause and prejudice" test applied to procedurally defaulted claims. [Cit.]

*Head v. Ferrell*, supra at 402 (III). In order to show "cause and prejudice" under *Strickland v. Washington*, Lewis must show that counsel's performance was not reasonable under the circumstances and that counsel's deficient performance prejudiced him, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 687-688, 694; *Smith v. Francis*, 253 Ga. 782, 782-784 (1) (325 SE2d 362) (1985). When appellate counsel's performance is alleged to be deficient because of a failure to assert an error on appeal, "the controlling principle is 'whether (appellate counsel's) decision was a reasonable tactical move which any competent attorney in the same situation would have made.' [Cit.]" *Shorter v. Waters*, 275 Ga. 581,

585 (571 SE2d 373) (2002). See also *Battles v. Chapman*, 269 Ga. 702, 705 (1) (a) (506 SE2d 838) (1998). With respect to the prejudice prong, a petitioner must show that, but for appellate counsel's errors or omissions, "there was a reasonable probability that the outcome of the appeal would have been different. [Cit.]" *Sloan v. Sanders*, 271 Ga. 299, 300 (519 SE2d 219) (1999). "[W]e accept the habeas court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. [Cit.]" *Turpin v. Lipham*, 270 Ga. 208, 211 (3) (510 SE2d 32) (1998).

In addressing whether Lewis can show "cause" to satisfy the "cause and prejudice" test, the Warden has challenged only the habeas court's finding of prejudice with respect to Lewis' ineffective assistance of appellate counsel claim that resulted in the vacation of his malice murder conviction. See *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993) (quoting *Strickland v. Washington*, supra at 697 (noting that a court may deny an ineffective assistance claim based solely on the absence of prejudice arising from counsel's alleged deficiencies)). Therefore, we assume that appellate counsel was deficient in failing to raise trial counsel's ineffectiveness. To decide whether Lewis was prejudiced by appellate counsel's failure to raise trial counsel's ineffectiveness, this Court must examine the underlying ineffectiveness of trial counsel claim and determine whether that claim would have had a reasonable probability of success. See *Brewer v. Hall*, 278 Ga. 511, 512 (1) (603 SE2d 244) (2004) (stating that, in order to succeed on an ineffective assistance claim that appellate counsel failed to assert trial counsel's ineffectiveness, the petitioner must show that, "but for his appellate counsel's deficient performance, he would have been granted a new trial on the basis of trial counsel's deficient performance").

In that vein, we reject Lewis' contention that he suffered a constructive denial of trial counsel and, thus, that prejudice may be presumed. See *United States v. Cronic*, 466 U. S. 648 (104 SC 2039, 80 LE2d 657) (1984). The habeas court did not find nor does our review of the record show that Lewis' case falls within that "very narrow range of cases" in which "a presumption of prejudice" is appropriate. *State v. Heath*, 277 Ga. 337, 339 (588 SE2d 738) (2003). Therefore, our analysis requires us to determine whether, but for the alleged deficiencies of Lewis' trial counsel, there is a reasonable probability that the jury would have returned a voluntary manslaughter verdict rather than a malice murder verdict. In order to conduct such an analysis, it is necessary to look both at the evidence actually presented at trial and the evidence available to trial counsel that they failed to present.

*B. Evidence presented at trial.* The habeas court correctly found that the State's theory of the case revolved around Lewis' need to

control the victim and his loss of that control. At trial, the State presented evidence that Ms. Lewis had told Lewis that she wanted a divorce a few months prior to the murder but that Lewis had vehemently argued against it and had continued to show up at Ms. Lewis' residence. Sometimes Ms. Lewis would let him in and sometimes she would not. As a result, the couple had had an "off-again and on-again relationship" until approximately two weeks before the murder when, in an attempt to end the relationship, Ms. Lewis had refused to let Lewis into her apartment or to respond to his pages.

The State presented evidence of several incidents of prior difficulties between Lewis and the victim that showed an escalating stalking pattern by Lewis toward her. The jury heard testimony regarding two incidents in the nine months prior to the murder in which the police were called to remove Lewis from the victim's residence, including one occasion during which Lewis yelled at Ms. Lewis "that it was gonna be this O. J. Simpson situation again" when he got out of jail. The jury also heard testimony regarding several instances of Lewis' threatening or harassing behavior toward Ms. Lewis and her children that occurred in the two months preceding the murder, including the facts that Lewis regularly showed up at their apartment, banging on the door, cursing loudly, and demanding to be let in; that he often sat across from their apartment staring at the window for hours at a time; that he entered their apartment without permission when no one was home; and that, because he often stood outside Kellee's school, Kellee was afraid and walked to school with a friend. Less than a month before the murder, Lewis kicked in the door to Ms. Lewis' apartment, and, as a result, she and her children moved in with her friend, with whom they were living at the time of the murder. During the two weeks prior to the crime, Lewis regularly came by Ms. Lewis' apartment and banged on the door, and he filled her pager with his pages. While Ms. Lewis had previously allowed Lewis back into her life, the State argued that this time she refused to do so.

The State presented evidence that on the night prior to the murder, Lewis came to Ms. Lewis' residence several times and banged on the door, demanding to be let in and saying that he was going to get in "one way or another," but the victim ignored him. On the evening of the murder, Lewis repeatedly banged on the apartment door, intermittently leaving to page the victim's pager, and then returning to continue banging on the door, cursing and shouting that he be let in.

The State's evidence also showed that the lock on the kitchen window had been pried off, and the State argued that Lewis had entered the apartment by breaking in through this window and that

he had obtained a knife from a kitchen drawer before going upstairs. The blood evidence showed that the altercation with the victim had started in the hall in front of the bedroom where her body was found. Although the State's witnesses testified that Epps approached the police in the parking lot wearing only his boxer shorts and that one open and one sealed condom package were present in the room where Ms. Lewis and Epps had been prior to the attack, the State's uncontroverted evidence also showed that no part of the struggle occurred in that room or in any room other than the one where the victim's body was found. Further, the trail of blood led directly down the stairwell to the rear sliding glass door and to the top of the patio fence.

Based on this evidence, the State argued that the victim heard Lewis break into the apartment, that she came out into the hall to meet him, and that the entire attack took place in the first bedroom at the top of the stairs where her body was found. The State contended that Epps, who was sleeping in another bedroom, heard Lewis and the victim fighting, passed by the bedroom where they were, saw Lewis but did not know what was going on, and left before Kellee ever responded to her mother's screams for help. According to the State, Lewis stabbed the victim after Kellee confronted him and then left the apartment through the sliding glass door in the back, went over the patio fence, and walked home. Because the clothing that Lewis was wearing when he was arrested matched the description that Kellee had provided to the police yet showed very little blood on them despite the bloody crime scene, the State theorized that Lewis had quickly washed his clothes upon returning to his apartment.

*C. Evidence presented in the habeas court.* The habeas court found that if trial counsel had presented the additional available evidence that habeas counsel presented, including Lewis' statements, evidence countering the State's portrayal of Lewis and his relationship with the victim, and evidence of Lewis' voluntary intoxication, and if trial counsel had properly impeached Kellee, there would have been a reasonable probability that the jury would have returned a voluntary manslaughter verdict.

> Voluntary manslaughter occurs when one kills another human being under circumstances which would otherwise be murder, if the killer "acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. . . ." OCGA § 16-5-2 (a).

*Mack v. State*, 272 Ga. 415, 417 (2) (529 SE2d 132) (2000).

*(1) Lewis' statements.* After his arrest, Lewis made a recorded statement to police in which he initially denied that he remembered being at the victim's apartment, explained that the only times he did not remember events were when he drank "a lot," and stated that he drank over 12 beers in the hours prior to the murder. As Lewis' interview with police progressed, he stated that he was beginning "to sober up" and that he recalled walking to the victim's apartment after leaving his friend's house, where he had been drinking. He then recalled entering the apartment through the kitchen and starting up the stairs. He stated that before getting all the way up the stairs, however, he decided to play "a practical joke" on Ms. Lewis by scaring her, so he turned around, went to the kitchen to get a knife, and headed back upstairs.

According to his statement, he saw the victim in the bedroom where she was killed, which was the first bedroom at the top of the stairs and was not the bedroom where Ms. Lewis had been with Epps. Lewis stated that, when the light came on and the victim saw him, "she had this surprised look on her face" and asked him "where the hell [he] c[a]me from." Lewis admitted cutting the victim, dropping the knife, and then going back downstairs and out the back door "really fast." He did not recall fighting with Ms. Lewis or seeing Kellee. He repeatedly denied that he was angry, and, at least eight times, he denied seeing or remembering that he saw Epps at the apartment.

Lewis also gave a short written statement in which he wrote that he was "so sorry" that he "took the life of [his] wife," that "it started as a joke just to sckair [sic] her," that he "made a mistake and cut her," and that he "never ment [sic] for any of this to happen." Although Walker's motion to exclude the statements was denied, the State did not proffer the statements at trial.

(a) The habeas court found that Lewis' statements "support the physical evidence suggesting that Mr. Lewis committed manslaughter, not capital murder, when [he] flew into a jealous rage after finding Mrs. Lewis with Robbie Epps in the apartment." While adulterous conduct can be the provocation sufficient to warrant a conviction for voluntary manslaughter, *Strickland v. State*, 257 Ga. 230, 231 (2) (357 SE2d 85) (1987), Lewis' statements do not support an inference that he "learned of such conduct immediately prior to the killing or that [Ms. Lewis] recounted [the alleged adultery] to [him] at the time of her killing so that provocation might cause a *sudden* passion. [Cit.]" (Emphasis in original.) *Culmer v. State*, 282 Ga. 330, 335 (4) (647 SE2d 30) (2007). On the contrary, Lewis stated that "[he] wasn't mad," that he "ha[d] no reason to be mad," that "[n]othing had happened between [him and the victim] for [him] to be mad," that his "intentions were to scare her," that it was a

"practical joke [that] just went too far," and that he did not see Epps. He repeatedly blamed his actions on "drink[ing] all that beer." Lewis' statements do not "contain any hint that he acted out of a sudden, violent, and irresistible passion. [Cits.]" *Demons v. State*, 277 Ga. 724, 725-726 (2) (595 SE2d 76) (2004). Accordingly, we conclude that the habeas court's finding that Lewis' statements support the physical evidence "suggesting" that he committed voluntary manslaughter is erroneous as a matter of law.

(b) The habeas court also found that the statements could have been used to support the claim that Lewis was intoxicated when he killed Ms. Lewis. The habeas court found that evidence of intoxication "would have contradicted the State's claim that the killing was premeditated." However, "[p]remeditation is not an element of murder" in Georgia. *Doss v. State*, 262 Ga. 499, 501 (4) (422 SE2d 185) (1992). What is required is a showing of an intent to kill, which is an essential element of both murder and voluntary manslaughter. *Nance v. State*, 272 Ga. 217, 221 (3) (526 SE2d 560) (2000). "To establish a voluntary intoxication defense, [Lewis] would have had to show that the intoxication had 'resulted in the alteration of brain function so as to negate intent. Even then, the brain function alteration must be more than temporary.' [Cits.]" *Bright v. State*, 265 Ga. 265, 273 (2) (e) (455 SE2d 37) (1995). Lewis has entered no evidence in the habeas record that would support such a voluntary intoxication defense.

To the extent that the habeas court concluded that evidence of Lewis' intoxication would have supported the theory of voluntary manslaughter, the habeas court erred as a matter of law. Showing that a defendant was intoxicated and "killed another in passion would not reduce the crime from murder to [voluntary] manslaughter." *Bradberry v. State*, 170 Ga. 859, 870 (9) (154 SE 344) (1930). The provocation required to mitigate malice is that which would arouse a heat of passion in a *reasonable* person. If voluntary intoxication were to have the effect of rendering an individual *unreasonably* subject to provocation, the offense would not be reduced to voluntary manslaughter. See *Partridge v. State*, 256 Ga. 602, 604 (4) (351 SE2d 635) (1987).

Had trial counsel presented evidence that Lewis was intoxicated at the time of the crimes, the State would have been entitled to request the trial court to instruct the jury that voluntary intoxication was not justification for a criminal act and to argue to the jury that such evidence would not excuse his conduct. See *Payne v. State*, 273 Ga. 317, 318 (4) (540 SE2d 191) (2001); OCGA § 16-3-4 (c). We note that at trial the State had requested such a charge on voluntary intoxication, which it withdrew when there was no evidence presented that Lewis was intoxicated at the time of the murder.

Accordingly, we find, as a matter of law, that the habeas court erred in finding that trial counsel's failure to admit Lewis' statements to show voluntary intoxication prejudiced him.

(c) The habeas court further found that Lewis' statements, particularly his "misspelled note full of pain and remorse," would have contradicted the State's claim that Lewis had no remorse for his actions. While Lewis did express some remorse in his statements, he also stated that he cut Ms. Lewis as "a practical joke," that he "didn't think that he hurt her that bad," and that after he cut her, he "just walked back down the stairs, went out the door and went home," where he ate and then took a walk. These statements likely would not have had much effect on the jury's verdict given the evidence presented at trial that, when Kellee tried to come to her mother's aid, Lewis forced her out of the room and inflicted over 40 injuries on her mother; that, when Kellee returned to the apartment after the police arrived, she found Lewis gone and her mother lying "in a pool of blood"; and that, in a vain effort to stop her mother's bleeding, Kellee's hand "fell through" her mother's neck. In light of the evidence showing the coldness, deliberateness, and brutality of Lewis' attack on Ms. Lewis while her children were only a few feet away and the fact that he fled after the attack leaving the children alone to discover her mutilated body, there is no reasonable probability that, had the jury heard the remorse that Lewis expressed in his oral and written statements, there would have been a different outcome at trial.

*(2) Testimony countering the State's portrayal of Lewis and his relationship with the victim.* Citing the affidavits of Kimberly Silinzy, Danny Cummings, and Lewis' family members, the habeas court found that trial counsel failed to offer readily available evidence that would have countered the State's portrayal of Lewis and his relationship with the victim.

The affidavit testimony of Lewis' family members contained information that the victim was manipulative and controlling and that she used drugs. Lewis has failed to show the admissibility of this evidence in the guilt/innocence phase. See *Roseberry v. State*, 274 Ga. 301, 303 (2) (553 SE2d 589) (2001) ("Evidence that impugns a victim's character cannot be admitted unless it has some factual nexus with the conclusion for which it is being offered."). The family members' testimony about the relationship between Lewis and the victim concerned the couple's relationship prior to 1995, which was at least a year before the murder. Lewis has not shown how such testimony would be relevant evidence regarding their relationship at the time of the crime. Furthermore, we find, as a matter of law, that such testimony would have carried little weight with the jury in light of the evidence actually presented at trial.

The habeas court also found that the affidavit testimony of Danny Cummings, the police officer who drove the children to the station after the murder, was consistent with a voluntary manslaughter defense. Cummings testified that he "knew Lewis from seeing him walking around the community" and that Lewis "was always quiet" and "always said hello." Cummings also testified that he remembered "a guy named Joe" who lived in the community and that "people would always be hanging out at his apartment smoking and drinking." Based on this testimony, the habeas court concluded that Cummings could have testified that Lewis was "a friendly, likeable person around town" and that Cummings could have "corroborated Mr. Lewis' story of drinking more than 12 beers on the day of the crime by directing counsel to the apartment complex where Mr. Lewis told counsel he was hanging out with 'Joe.' " The habeas court then concluded that trial counsel could have used this information to support a theory of voluntary manslaughter.

Even assuming that Cummings' testimony entitled the habeas court to reach the factual conclusions that it did, the habeas court failed to explain and we fail to discern how testimony regarding Lewis' general friendliness could serve as admissible evidence supporting a theory of voluntary manslaughter. See OCGA § 16-5-2 (a). As to Cummings' testimony corroborating Lewis' statement that he drank 12 beers on the day of the crime, we reiterate that evidence that a defendant was intoxicated would not reduce the crime from murder to voluntary manslaughter. See *Bradberry v. State*, supra at 870 (9).

Lewis also presented the affidavit testimony of Kimberly Silinzy, Ms. Lewis' friend in whose apartment Ms. Lewis and her children were living at the time of the murder. The habeas court found that Lewis was prejudiced by trial counsel's failure to present this testimony at trial, because Silinzy's testimony that she never witnessed any domestic violence by Lewis against the victim could have countered the State's evidence of such abuse. We conclude, however, that Silinzy's testimony would not have been able to counter the significant evidence of Lewis' threatening and harassing behavior toward the victim actually presented at trial, particularly in light of the evidence that the victim and the children were living with Silinzy because Lewis had kicked in the door to their apartment. Moreover, the State could have argued that the victim and her children had only been living with Silinzy for less than a month and that much of Lewis' harassment occurred at night when Silinzy was at work and away from the apartment. In fact, both children testified at trial that, on the night of the murder, Lewis began banging on the door and demanding that he be let inside only after Silinzy left the apartment to go to work.

The habeas court also found that Silinzy's testimony regarding the relationship between Lewis and the victim "would have undercut the State's theory of the case." Silinzy testified that the victim told her several things about that relationship, including that she and Lewis had sexual relations approximately two weeks before the murder, that Lewis had seen Epps "drop her off one night at her house," and that the victim "loved [Lewis], but she did not want to live with him when he was using drugs." The habeas court found that this testimony would have supported a voluntary manslaughter theory. Given Lewis' failure to show Silinzy's testimony about his and the victim's relationship to be anything other than hearsay,

> his failure to attempt any showing of why the general exclusion of hearsay should not apply in this case, and his failure to show any specific lawful use of the statement[s], the [hearsay] statement[s in Silinzy's affidavit] must be regarded as completely inadmissible and without probative value. [Cits.]

*Waldrip v. Head,* supra at 828 (II) (A) (refusing to consider inadmissible hearsay on appeal despite the absence of any objection).

Even assuming Lewis could establish the admissibility of this testimony, the fact that the couple had had sexual relations approximately two weeks before the crime would not run counter to the State's theory that Lewis had become increasingly aggressive when Ms. Lewis had refused to have contact with him in the two weeks prior to the murder. Nor would the testimony that the victim loved Lewis, but did not want to live with him when he was on drugs run counter to this theory. The jury could have viewed such testimony as an explanation of why the couple had an "off-again and on-again relationship" and why Ms. Lewis was attempting to finally end that relationship. Further, although Silinzy did not state when Lewis saw Epps drop Ms. Lewis off at her home, clearly it was prior to the night of the murder and, therefore, would hardly contribute to evidence of "provocation [that] might cause a *sudden* passion" on the night of the murder. (Emphasis in original.) *Culmer,* supra at 335 (4). While Silinzy testified in her affidavit and also told the police that Lewis and Ms. Lewis had an "on-going" relationship, this testimony would likely have had little effect on the jury in light of the evidence of the couple's tumultuous relationship presented at trial and the testimony that the State could have elicited on cross-examination that Silinzy also told the police that she told Ms. Lewis that she suspected that Lewis was "watching" her, that she had an uneasy feeling about his being around, and that he had scared Ms. Lewis before. Accordingly, there is no reasonable probability that this additional evidence

would have led a jury to return a verdict of voluntary manslaughter rather than malice murder.

*(3) Impeachment evidence.* The habeas court also concluded that trial counsel's failure to effectively impeach Kellee with an allegedly-inconsistent statement prejudiced Lewis. The habeas court did not explain whether such impeachment would have made a voluntary manslaughter verdict more likely or exactly how it otherwise would have contributed to a different outcome. Nor did the habeas court explain whether this finding independently supported its conclusion that Lewis had established prejudice or, instead, whether the court was relying on the cumulative prejudicial effect of trial counsel's other errors in failing to investigate and present evidence of voluntary manslaughter. In any event, we find that Lewis has failed to show how he was prejudiced by trial counsel's alleged failure to properly impeach Kellee.

The allegedly-inconsistent statement was in the form of testimony at the preliminary hearing by Lieutenant Keith Knowles, who had originally been the lead investigator in the case. At the preliminary hearing, Knowles testified on direct examination that Kellee told him that she saw Lewis in the apartment and that "Chris," whom Knowles determined to be Lewis, had killed her mother. However, in response to a question on cross-examination regarding Kellee's hearing Lewis and her mother fighting, Knowles stated that Kellee did not see the actual confrontation that occurred. Knowles also testified that Kellee "stated she didn't see what had happened" and that she did not see Lewis attacking her mother. This testimony appeared to be inconsistent with Kellee's testimony that she saw Lewis holding a knife while kneeling over her mother.

Prior to the presentation of the defense's case-in-chief, Walker represented to the trial court that the defense had been unable to locate Knowles and that he was unavailable. Walker stated that the defense wished to present the testimony of the court reporter who had transcribed the preliminary hearing in order to admit the preliminary hearing transcript for the purpose of impeaching Kellee. The State objected and offered to secure Knowles' presence on behalf of the defense, which it did. Knowles subsequently testified for the defense. However, on cross-examination by the State, he clarified that, while Kellee told him that she had not witnessed the initial confrontation between Lewis and her mother, she had told him that she did go to help her mother and that she did see Lewis attacking her mother. Knowles also testified, consistent with his preliminary hearing testimony, that Kellee had positively identified Lewis as being in the apartment, that she had provided a description of Lewis' clothing that accurately matched what he had been wearing when he was arrested, and that she was hysterical and upset and did not want

to talk to anyone at the time that he spoke with her.

The habeas court found it "highly unlikely that Kellee would have been able to blunt the impeachment of her trial testimony as effectively [as Knowles] if she had been cross-examined effectively about what she told Knowles after the murder." Prior to Knowles' trial testimony, Lewis' co-counsel, Hicks, cross-examined Kellee but did not question her regarding the specific content of Knowles' testimony, because he had not read the preliminary hearing transcript. Had Hicks attempted to properly impeach Kellee with Knowles' testimony, he would have been required to lay the proper foundation by first asking Kellee on cross-examination about the statements she had made to Knowles and then giving her an opportunity to explain any apparent inconsistencies. See OCGA § 24-9-83; *Carter v. State*, 244 Ga. 803, 805-806 (2) (262 SE2d 109) (1979).

A review of the trial transcript shows that, in fact, Hicks did cross-examine Kellee regarding whether she remembered talking to Knowles after the incident. Kellee responded that she was not sure and that, while she did recall talking to an officer, she did not "know what she said." In response to further cross-examination, she indicated that no officers interviewed her in the apartment right after the incident and that her first police interview was conducted at the police station. Hicks did not pursue the matter. Because Hicks did not ask Kellee whether or not she stated to Knowles that she did not see Lewis attacking her mother, he failed to lay the required foundation for impeachment. *Carter v. State*, supra at 806 (2) (setting forth the proper procedure under former Ga. Code Ann. § 38-1803, now OCGA § 24-9-83, for laying the foundation for impeachment by prior inconsistent statements).

However, Lewis has not shown how Kellee's testimony would have been affected by an attempt to confront her with Knowles' preliminary hearing testimony, and the habeas court was not authorized to presume prejudice from a silent record. See *Allen v. State*, 277 Ga. 502, 503 (3) (591 SE2d 784) (2004). The only other possible prejudice that Lewis could assert from trial counsel's alleged failure to impeach a witness would be the inability to introduce the impeaching evidence. As discussed above, Lewis did present Knowles to testify regarding the allegedly-inconsistent statements in his preliminary hearing testimony. See *Woods v. State*, 269 Ga. 60, 63 (3) (495 SE2d 282) (1998) (stating that the proper method of impeachment of a witness by the officer who had interviewed the witness is that officer's testimony). According to Knowles' explanation of his statements, Kellee did not make a statement to him that was inconsistent with her trial testimony.

Furthermore, even assuming that trial counsel had cross-

examined Kellee regarding the alleged statements she made to Knowles and assuming that she would not have been able to "blunt" his cross-examination as effectively as Knowles did, the neighbor to whom Kellee ran for help testified that, as soon as she met Kellee at her door, Kellee told her that her stepfather, Christopher Lewis, was killing her mother. The neighbor also testified that she heard Kellee tell the 911 operator that Lewis was on top of her mother, and the police officer who responded to the 911 call testified that he overheard Kellee tell the investigators at the crime scene that Lewis killed her mother. Finally, the detective who interviewed Kellee at the police station shortly after the murder testified that Kellee gave "a perfect visual picture" of what Lewis was wearing when he was killing her mother. In light of the testimony from these witnesses corroborating Kellee's statements made during or shortly after the incident that Lewis was the one attacking her mother, Kellee's accurate description of Lewis' clothing, her testimony that she did not recall speaking to Knowles or what she said, and the trial testimony by several witnesses that she was hysterical and distraught at the crime scene, we conclude that, even had trial counsel cross-examined Kellee regarding Knowles' statements, he would not have been able to raise significant doubts about Kellee's identification of Lewis as her mother's attacker and, thus, that there is no reasonable probability that such cross-examination would have altered the outcome of Lewis' trial.

*(4) Evidence of mental retardation.* As noted above, the habeas court found that Lewis established that he is mentally retarded beyond a reasonable doubt, see *Turpin v. Hill*, 269 Ga. 302, 304 (4) (498 SE2d 52) (1998) (authorizing habeas courts to address belated mental retardation claims under the "miscarriage of justice" exception), and the Warden has not appealed that finding.

The habeas court also found that Lewis was prejudiced by trial counsel's failure to properly develop and present evidence of Lewis' mental retardation in the guilt/innocence phase, concluding that "there is a reasonable probability that the jury would have made a finding that Mr. Lewis is mentally retarded, a finding that would have eliminated the death penalty as an option." The habeas court is correct in that "[a] jury finding that a capital defendant is 'guilty but mentally retarded' requires that the trial court sentence the defendant to life imprisonment." (Citations omitted.) *Stephens v. State*, 270 Ga. 354, 356 (2) (509 SE2d 605) (1998). See OCGA § 17-7-131 (j).

Because the guilt/innocence phase of Lewis' trial occurred after the enactment of OCGA § 17-7-131 (j), this finding of ineffective assistance by the habeas court entitles Lewis to a new sentencing trial where he bears the burden of proving his alleged mental

retardation beyond a reasonable doubt. See *Stephens v. State*, supra at 357 (2). However, the habeas court's unappealed finding that Lewis is mentally retarded beyond a reasonable doubt based on a "miscarriage of justice" renders moot a new sentencing trial on that basis.

Lewis contends, however, that the habeas court also properly relied on trial counsel's failure to present evidence of mental retardation in the guilt/innocence phase to support its finding that Lewis was prejudiced by trial counsel's failure to present the theory of voluntary manslaughter. Upon our review of the habeas court's order, we conclude that the habeas court correctly did not make such a finding.

> [W]hen the evidence raises the offense of voluntary manslaughter, the question is whether the defendant acted out of passion resulting from provocation sufficient to excite such passion in a *reasonable person*. It is of no moment whether the provocation was sufficient to excite the deadly passion in the particular defendant. [Cits.]

(Emphasis in original.) *Lewandowski v. State*, 267 Ga. 831, 832 (2) (483 SE2d 582) (1997). See also *Nelson v. State*, 254 Ga. 611, 615 (3) (331 SE2d 554) (1985) (" 'Mental abnormality or mere weakness of mind is no excuse unless it . . . deprives the offender of the ability to distinguish right from wrong.' ").

*(5) Trial counsel's actual innocence theory.* Finally, our review of the trial transcript leads us to conclude that trial counsel's actual innocence theory was not "wholly unsupported," as the habeas court found. At trial, Walker argued the following: that Lewis and the victim were attempting to reconcile; that, although Lewis was not allowed to have a key to the apartment where the victim and her children were staying, the kitchen window was left unlocked to allow his entry because of the couple's attempt at reconciliation; that when Lewis went upstairs to the bedroom in which the victim was killed, he found her already "dead or dying"; and that he got blood on himself, panicked, and left. The habeas court found that Lewis was prejudiced by Walker's failure to explain the State's evidence showing that the lock had been pried off the kitchen window. However, even if trial counsel had pursued the voluntary manslaughter theory, they would have had to contend with this evidence, and Lewis failed to show how another approach that trial counsel might have taken would in reasonable probability have more effectively refuted the evidence showing that he broke into the apartment. Therefore, he has failed to establish that this alleged instance of ineffectiveness prejudiced his defense. See *Pringle v. State*, 281 Ga. App. 230, 234 (2)

(a) (635 SE2d 843) (2006) (holding that a defendant cannot show prejudice with regard to trial counsel's failure to refute the State's evidence where he made no proffer as to what a thorough investigation would have revealed).

Trial counsel sought to create a reasonable doubt in the minds of the jurors that Lewis had committed the murder by attacking the police investigation of the crime scene; by suggesting that a hysterical Kellee had seen Lewis in the apartment but had not actually seen him attacking her mother; by showing that Lewis had very little blood on him at the time of his arrest despite the large amount of blood at the crime scene; and by suggesting that Epps had committed the crime, had quickly showered in the upstairs bathroom, and had then run outside just before the police arrived. Although the police report showed that the police arrived three minutes after receiving the 911 call, that was not indicative of how much time Epps might have had to shower. Kellee testified that she had had to seek help from a neighbor before the call was made, and Walker pointed out that the neighbor testified that 10 to 15 minutes passed between the time that she met Kellee and the time that the police arrived.

To counter the children's testimony that Lewis regularly banged on the apartment door and sat outside the apartment for hours watching the window, Walker elicited testimony from Ms. Lewis' neighbor that she had never observed anyone "just hanging around" or heard any disturbances at Ms. Lewis' apartment. Trial counsel also attacked the investigation of the case through the cross-examination of the State's witnesses. Walker elicited testimony from the State's DNA analyst that she saw no evidence that there had been attempts to remove blood from Lewis' clothing. During the police investigators' cross-examination, Walker elicited testimony that they had approached the crime scene believing that the perpetrator had already been identified and that he had little time for clean-up, allowing Walker to argue that the police had failed to thoroughly check the bathrooms for evidence that someone had washed up there and had failed to adequately inspect Epps for evidence that he could have been involved in the murder.

Trial counsel supported their innocence theory with the testimony of Patrick Coffey, their investigator and blood spatter expert. Coffey testified that, based on his analysis, the perpetrator would have sustained a significant amount of blood on the upper part of his body as a result of the attack and that the large amount of blood at the crime scene and the small amount of blood on Lewis and his clothing at the time of his arrest indicated that Lewis was not the assailant. He also testified that a "quick washing" would not have rid Lewis' clothing of the amount of blood that he opined the perpetrator's clothing would contain. Coffey also attacked the inves-

tigation of the crime scene, pointing out, for instance, that blood samples should have been taken at different locations throughout the crime scene to determine whether there was more than one blood type present, because it was likely that the perpetrator was also injured in the struggle.

During rebuttal of Coffey's testimony, the State's witness defended the police investigation of the case by explaining that the police had been told the identity of the perpetrator when they arrived on the scene, and, thus, they were not dealing with "a who-done-it scene that would demand an entire scene processing." While the habeas court found that the State ridiculed the crime scene investigation conducted by Coffey in its closing argument, a review of the trial transcript shows that Walker was similarly able to use this rebuttal testimony in making his closing argument to the jury. In addition, Walker pointed out the State's failure to address certain issues, including Epps's location at the time of the attack and the identity of a partial bloody shoe print found on a sheet at the entrance to the room where the body was found. All things considered, we conclude that the habeas court erred as a matter of law in finding that Lewis was prejudiced by trial counsel's presentation of their actual innocence theory.

*D. Total effect of trial counsel's errors.* Upon a thorough review of the record and consideration of all of the instances of ineffective assistance of trial counsel in the guilt/innocence phase as found by the habeas court, we are not persuaded that, had the jury heard the evidence presented in the habeas court, there is a reasonable probability that it would have convicted Lewis of voluntary manslaughter instead of malice murder even had it been presented with that choice. See *Strickland v. Washington*, supra at 687 (holding that an ineffective assistance of counsel claim can succeed only upon a showing of both deficient performance and prejudice of constitutional proportions); *Smith v. Francis*, supra at 783. See also *Schofield v. Holsey*, 281 Ga. 809, 812 (II), n. 1 (642 SE2d 56) (2007) (holding that the combined effect of trial counsel's deficiencies should be considered in weighing prejudice). This conclusion is supported by the strong evidence recounted above undermining any voluntary manslaughter theory.

Because trial counsel's purported deficient performance in pursuing an actual innocence theory rather than investigating and presenting the evidence supporting the theory of voluntary manslaughter presented in the habeas court did not prejudice Lewis, there is no reasonable probability that, had appellate counsel raised this claim of trial counsel's ineffective assistance in the motion for new trial and on direct appeal, Lewis would have been granted a new trial on that basis. Therefore, Lewis cannot show "cause" to satisfy

the "cause and prejudice" test and, thereby, to overcome the procedural default to his underlying claim regarding the ineffectiveness of trial counsel. *Head v. Ferrell*, supra at 402 (III). Accordingly, we reverse that portion of the habeas court's order vacating Lewis' malice murder conviction.

*E. Lewis' felony murder convictions.* The jury in Lewis' case also returned guilty verdicts on two counts of felony murder, which were vacated by operation of law. *Lewis v. State*, supra at 534, n. 1. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Because we have reversed the habeas court's vacation of Lewis' malice murder conviction, we need not address the Warden's contention that Lewis' convictions on those alternative felony murder counts no longer stand vacated as a matter of law. See *Cochran v. State*, 276 Ga. 283, 285 (2) (576 SE2d 867) (2003).

*III. Remaining Claims*

The habeas court reserved ruling on several claims that Lewis raised in his amended petition. We remand the case to the habeas court for consideration of those unresolved claims.

*Judgment reversed in part and case remanded in part. All the Justices concur.*

DECIDED MARCH 22, 2010.

*Thurbert E. Baker, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Patricia A. Burton, Senior Assistant Attorney General, Richard Tangum, Assistant Attorney General*, for appellant.

*Schiff Hardin, Paul E. Greenwalt, Heidi Oertle, Ann H. Mac-Donald*, for appellee.