315 Ga. 86
FINAL COPY

S22P0556.  BROOKINS v. THE STATE.

BETHEL, Justice.

A jury found Brian Duane Brookins guilty of the murders of Sandra Suzanne Brookins and Samantha Rae Giles and of related crimes.  The jury declined in its guilt/innocence phase verdict to find Brookins "mentally retarded" or "mentally ill."[1]  At the conclusion of the sentencing phase, the jury found multiple statutory aggravating circumstances and sentenced Brookins to death for each of the two murders.  For the reasons set forth below, we affirm Brookins's

---

[1] At the time of Brookins's trial in 2007, both Georgia law and the mental health profession used the term "mental retardation" rather than the now-preferred term of "intellectual disability."  See *Hall v. Florida*, 572 U. S. 701, 704 (I) (134 SCt 1986, 188 LE2d 1007) (2014) (noting the change in terminology); OCGA § 17-7-131 (as amended in 2017 by Ga. L. 2017, p. 471, § 3).  We use both terms in this opinion, using "intellectual disability" when speaking in general terms and using "mental retardation" in our discussion, particularly in our quotations, of the specific proceedings below and the law that applied at that time.

convictions and sentences.[2]

---

[2] The crimes occurred on October 14, 2005. On January 9, 2006, Brookins was indicted by a Baldwin County grand jury on two counts of malice murder, two counts of felony murder, aggravated stalking, cruelty to children in the third degree, and possession of a firearm by a convicted felon. On February 6, 2006, the State filed written notice of its intent to seek the death penalty. Brookins's trial began with jury selection on October 1, 2007, the jury found him guilty on all counts on October 13, 2007, and the jury recommended death sentences in a sentencing verdict on October 16, 2007. Later on October 16, 2007, the trial court vacated, by operation of law, the two felony murder counts and sentenced Brookins to death for each of the two counts of malice murder and to consecutive terms of imprisonment of ten years for the one count of aggravated stalking, one year for the one count of cruelty to children in the third degree, and five years for the one count of possession of a firearm by a convicted felon. On November 8, 2007, Brookins filed a motion for a new trial, which he amended on May 27, 2011, and which the trial court denied in an order filed on April 10, 2012. On June 6, 2012, the trial court filed an order granting Brookins's motion for an out-of-time appeal, and Brookins then filed a notice of appeal on June 12, 2012. This out-of-time notice of appeal would have been untimely in an ordinary criminal appeal, see *Cook v. State*, 313 Ga. 471, 503-504 (3) (e) (870 SE2d 758) (2022); however, upon receiving briefing from the parties at our specific request, we adhere to our previous holding that the absence of a valid notice of appeal does not deprive this Court of jurisdiction to fully consider all enumerations of error on appeal in a case where a death sentence has been imposed, see *Lance v. State*, 275 Ga. 11, 11 n.1 (560 SE2d 663) (2002) (citing OCGA § 17-10-35 and Unified Appeal Procedure ("UAP") Rule IV (A) (3)), overruled on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018). On November 13, 2013, Brookins filed a supplemental motion for a new trial or, alternatively, for reconsideration of the order denying the amended motion for a new trial, and the trial court denied that motion in an order filed on June 25, 2021. An appeal was docketed in this Court on October 18, 2021, as Case No. S22P0235; however, on December 10, 2021, this Court struck the appeal from its docket and remanded the case in order to return jurisdiction to the trial court to consider matters that occurred after Brookins's filing of a notice of appeal. On January 5, 2022, the trial court filed a reissued order denying Brookins's supplemental motion for a new trial or, alternatively, for reconsideration of the order denying the motion for a new

*Sufficiency of the Evidence in the Guilt/Innocence Phase*

1. (a) The evidence of Brookins's guilt, which was essentially conceded by Brookins at trial, showed as follows.[3] Brookins was married to Sandra Suzanne Brookins, and Samantha Giles was his 15-year-old stepdaughter. The couple had been having marital difficulties, and they had started divorce proceedings that were later stopped. A county solicitor general, acting in her official capacity, had met Ms. Brookins in 2000 and had counseled her about her concerns for her safety. Others had done likewise.

On September 14, 2005, Brookins had been arrested for stealing "four-wheelers." While in jail, Brookins told two fellow inmates, referring to Ms. Brookins, that he was going to "kill that

trial. Upon this Court's receiving the record of the remand proceedings, the case was redocketed to the term of this Court beginning in April 2022 under the current case number, and Brookins filed a new notice of appeal on January 18, 2022. The case was orally argued on May 17, 2022.

[3] We note here that this Court no longer engages in the sua sponte review of the sufficiency of the evidence in murder cases that have *not* resulted in death sentences. See *Davenport v. State*, 309 Ga. 385, 391-399 (4) (846 SE2d 83) (2020) ("[O]ur new approach of not automatically considering sufficiency sua sponte in non-death penalty cases will begin with cases docketed to the term of court that begins in December 2020.").

snitchin' b***h," and he told a third inmate that the best thing the county solicitor general could do would be to keep him in jail, because he was "going to kill the b***h" and her "whole family" and then "go after" the solicitor general next if he got the chance. Brookins was released on bond on October 5, 2005, subject to the condition that he have no contact with Ms. Brookins or Samantha. Ms. Brookins was afraid at that time because, as she had reported to a detective and to a close friend, Brookins had called her from the jail accusing her of reporting him to the detective concerning the stolen "four-wheelers."

In the days leading up to the murders, including finally on October 12, 2005, Brookins repeatedly asked the girlfriend of one of his former fellow inmates if he could buy her .38 caliber revolver. The woman resisted but eventually sold Brookins the gun, which the woman identified at trial as being the same as the weapon used by Brookins in the murders.

Also on October 12, Ms. Brookins, who had been staying at her mother's house with her children for safety, called the detective to

4

report that her home had been broken into and a shotgun had been taken from her bedside and that she suspected Brookins because "he knew it would upset her" and because there were no signs of forced entry. She called the detective again later that day to report another burglary of her home involving a television, a DVD player, and a video game. Also on or about October 12, a neighbor who lived next door saw Ms. Brookins arrive at her home, saw Brookins come out of the home, heard Ms. Brookins telling Brookins to leave because he was not supposed to be there, and saw Ms. Brookins back up in her car and leave.

On the morning of October 14, a neighbor who lived "five or six houses down" from Ms. Brookins observed Brookins driving past Ms. Brookins's home "[p]robably nine or ten times" without stopping. At around noon on October 14, the neighbor who had seen Brookins on October 12 was arriving home from a store and saw Brookins on the front porch of Ms. Brookins's home and called the sheriff's office, as Ms. Brookins had asked her to do. However, after Brookins saw her and walked to the back of Ms. Brookins's house and after she waited

15 minutes for a sheriff's officer to arrive, she left.

Sometime between 1:00 and 3:00 p.m. on October 14, Brookins visited a pawn shop. Brookins asked if they had "any AKs or SKSs" and explained that he wanted such an assault rifle for deer hunting. However, Brookins left when he was told that the store had no assault rifles in stock.

At roughly 2:00 p.m. on October 14, the next-door neighbor who had seen Brookins at noon returned home and again saw Brookins, this time standing toward the back of Ms. Brookins's house. Later, this neighbor was looking out her window and saw Ms. Brookins and Samantha arriving and then heard two groups of gunshots.

Also on October 14, a man was talking on his cell phone in the back yard of his mother's home, which was next door on the other side of Ms. Brookins's home. Sometime around 2:30 or 3:00 p.m., he observed Ms. Brookins, with Samantha in her car, pulling into her driveway and then honking and waving to him as she passed the side of her home. However, when Ms. Brookins got to the back of her home, he saw her immediately back up to the front of her home,

6

turn her car around to face the road, and park near the front door, a place where he had never seen her park before. He walked down a path between the homes to Ms. Brookins's yard and saw Brookins coming from the far end of the home holding a pistol in one hand, heard Brookins repeatedly yelling "you mother f***ing b***h" at Ms. Brookins, heard one shot, saw Ms. Brookins on the ground with Brookins "kicking and stomping her," and saw Brookins shoot her again. As the neighbor ran toward his mother's home, he turned and saw Samantha running behind him. After he slammed his mother's door shut, he heard another shot. He had his mother and other family members get on the floor, tried unsuccessfully to call 911, scrambled around looking out windows, and heard yet another shot. From the window of a door in the back of his mother's house, he saw Samantha lying in the middle of the path between the two homes. He then went outside to the driveway and saw Brookins driving up the road in Ms. Brookins's car. All three members of a family that lived across the street from Ms. Brookins also saw parts of the crimes, and they identified Brookins as the perpetrator.

7

Tire impression evidence and witness testimony showed that Brookins drove Ms. Brookins's car from Ms. Brookins's home after the murders to a place near some train tracks, where he had parked his truck before walking about 17 minutes to Ms. Brookins's home on a "four-wheeler" path through some woods. From there, Brookins drove in his truck to his parents' home, where he threatened suicide. The sheriff and another officer talked to Brookins in his parents' driveway for about an hour before Brookins placed his pistol in the back of his truck and was arrested.

Officers who arrived at the scene of the murders found Ms. Brookins's body lying face down on the ground near the steps to her front porch and Samantha's body partially curled-up and lying face down on the path leading to the neighbor's home. An autopsy showed that Ms. Brookins had gunshot wounds to her right breast, to her left elbow, and to the back of her head. An autopsy also showed that Samantha had gunshot wounds to her lower back and to her right side that were not from close range, along with a third gunshot wound an inch and a half above her right ear with a

gunpowder-stipling pattern consistent with the shooter having stood over her while firing. A firearms examiner determined that the bullets that killed the victims were fired from the .38 caliber revolver obtained from Brookins at his surrender to the sheriff. The firearms examiner also determined that the shot to Samantha's head was fired from no more than 15 inches and likely from four to six inches.

(b) Brookins and the State presented competing evidence and arguments regarding Brookins's claims that he was intellectually disabled and that he was mentally ill. See OCGA § 17-7-131 (a) (2)-(3) (defining these mental conditions both before and after a reordering of the relevant sections by Ga. L. 2017, p. 471, § 3). On behalf of the State, a number of non-expert witnesses gave testimony that shed light on Brookins's day-to-day abilities and activities, such as the fact that he was very knowledgeable about cars and was adept at repairing them, that he readily carried on conversations about his own legal issues and other matters, and that there was nothing at all noticeable about him that suggested mental

9

impairment. Brookins's childhood school psychologist testified that he had known Brookins and had evaluated him at the ages of 7, 10, and 13 and that Brookins's IQ scores at those times were 92, 84, and 90, respectively. He explained that Brookins was diagnosed as having a learning disability based on his difficulty processing information presented audibly, but he added that even in his weakest area, his language skills, Brookins was operating at least at a low-average level. He testified that there had been no reports of any problems with Brookins's adaptive functioning and that Brookins's shortcomings were conduct-related rather than based on intellectual or even emotional factors. Specifically, he cited reports that, in addition to being frustrated, Brookins had been manipulative, unwilling to exert effort, unwilling to accept responsibility for his actions, defiant, and oppositional.

A psychiatrist from Central State Hospital gave Brookins the following diagnoses, including some indicating that he was "malingering" or feigning symptoms: Panic Disorder without Agoraphobia; Malingering of Psychotic Symptoms; Malingering of

Dissociative Symptoms; Adjustment Disorder, Chronic, with Mixed Anxiety and Depressed Mood; Attention Deficit Hyperactivity Disorder, Predominantly Hyperactive-Impulsive Type; Alcohol Abuse by History and Benzodiazepine Abuse; Antisocial Personality Disorder; Borderline Personality Disorder; and Borderline Intellectual Functioning. She explained that neither of Brookins's personality disorders rendered him incapable of understanding and making choices in the realm of criminal behavior. As to intellectual disability, she testified that Brookins's IQ had been tested as 72 by her colleague, but she explained that, based on her 14 hours of talking with him, she had expected an IQ score "probably in the mid-80s." She explained that she did not find Brookins to suffer from any deficits in adaptive functioning resulting from any intellectual deficit. Instead, she found his adaptive deficits in the areas of finances, health, and personal safety to have been the result of his Antisocial Personality Disorder. She acknowledged that Brookins had mood swings and had been previously diagnosed several times with Bipolar Disorder, but she explained that those prior diagnoses

11

had been based largely on his inaccurate self-reporting, that his "objective symptoms" did not support such a diagnosis, and that his observable symptoms seemed better explained by his Borderline Personality Disorder. She also disagreed with Brookins's prior diagnosis of Intermittent Explosive Disorder, concluding that his related symptoms were better explained by his Borderline Personality Disorder and his Antisocial Personality Disorder. She acknowledged that Brookins had suffered multiple head traumas during his lifetime, but she noted that those incidents had not seemed to cause any personality changes, such as increased aggressiveness, because he had exhibited the same demeanor prior to his head traumas. Finally, she explained that Brookins had been given an MRI scan of his brain but that it had been interpreted by a radiologist at Central State Hospital as normal.

A psychologist from Central State Hospital testified that he had given an intelligence test to Brookins showing a score of 71, with a range of scores within the standard error of measurement of 65 to 79, and that he had given another, more-precise intelligence test

12

showing an IQ of 72, with a range of scores of 68 to 77. He rejected the theory, highlighted in Brookins's opening statements, known as the "Flynn Effect" that some experts have used to lower IQ scores from those actually tested where the test involved has not been normed to the overall population recently, noting that the theory was not endorsed by the publisher of Brookins's IQ test and that some studies of recent population trends have even shown that IQ scores on aging tests should be adjusted *upward*. He testified that he saw no signs of psychiatric symptoms but that he had found instead that Brookins had feigned some such symptoms. Specifically, he testified that he thought that Brookins was "malingering symptoms of a psychotic nature" and that he did not believe that Brookins "was suffering from manic phase or Bipolar Disorder." He explained that he had not observed malingering by Brookins on his intelligence evaluation, but he added that he could not rule that out. Finally, he testified that he disagreed with Brookins's prior diagnoses of Intermittent Explosive Disorder based on Brookins's "pattern of behavior."

The defense presented testimony first from a woman who had been Brookins's "learning disabilities resource room teacher in the 2nd and 3rd grades." She worked with him on only "language arts subjects" for two hours a day, while some students with more problems would see her for four hours a day. She described him as "a typical little boy" and noted that he showed good progress in language arts under her instruction and that he had never shown any problems in math or in any other area other than language arts. Finally, she stated that she found the school psychologist's findings to be correct.

The defense next presented testimony from a psychologist who had evaluated Brookins over a total of 17 hours. He testified that Brookins "had a receptive language disorder and an expressive language disorder." He explained that his testing of adaptive functioning showed deficits in the areas of communication, daily living, and socialization. He also explained that a particular test of Brookins showed a score "almost identical" to those with "documented brain injuries," that his symptoms were "very common

14

among people that have partial complex seizures," and that he showed evidence of dementia or "a deteriorating brain." He acknowledged that he had relied on low IQ test scores from 2001 and 2004 but had only recently learned about eight test scores from before 2001; however, he questioned whether Brookins's decline in IQ scores might have stemmed from "various sources including his partial seizure aspect that is continuing" and might have occurred prior to the age of 18. He explained that Brookins's scores on one test could be interpreted as his being distractible, being confused, having poor memory, "being bipolar and paranoid," or "hav[ing] been exaggerating some symptoms." Finally, he stated that he believed that Brookins suffered from Post-Traumatic Stress Disorder.

Brookins next presented testimony from a neuropsychiatrist. He explained that it was unusual for someone's IQ scores to decline as Brookins's had done. He favorably noted Brookins's prior diagnoses of Antisocial Personality Disorder and Attention Deficit Hyperactivity Disorder, and he also briefly noted Brookins's other prior diagnoses, which were not accepted by the State's experts, of

15

Bipolar Disorder and Intermittent Explosive Disorder. He agreed with the radiological diagnosis of spina bifida reached at Central State Hospital based on an abnormality in Brookins's lower spine, and he faulted Brookins's mental health team for not taking special note of that diagnosis and expressed his own opinion that the diagnosis was "unambiguous proof that [Brookins's] brain did not develop properly." He also disagreed with the conclusion of the radiologist at Central State Hospital that an MRI scan of Brookins's brain showed nothing abnormal, concluding instead that it showed portions of "dead brain, scarred useless brain" in the frontal lobe that he referred to as leukoaraiosis, that he explained was comparable to what is found in elderly patients with dementia, and that he posited had occurred as a child or as a young adult, "many, many years in advance to the time of this incident." He summarized the effects of his findings as follows:

> Mr. Brookins has had many diagnoses, okay. ADD, antisocial or psychopathy, bipolar, intermittent explosive disorder. What are the common themes of all of those? Impulse control problems, anger problems, mood control problems. Constantly doing the wrong thing, in spite of

16

ample opportunity to learn to do the right thing. Especially given ample punishment, such as all the incarcerations and his, you know, run-ins with the law. This is typical of someone with frontal lobe injury. They just don't get it and they don't learn and they keep doing the same wrong thing, because their brain won't let them do the right thing.

The defense next presented lay testimony from Brookins's brother, sister, and mother. His brother testified that Brookins would "lose his temper quicker than . . . the average person" and would make decisions impulsively, "especially if it . . . had to do with him getting upset or getting angry." His sister explained that Brookins "was always more aggressive" than others, "didn't learn easily," and "became a bully" as he got older, perhaps because he thought it "was cooler to be a bully than to be . . . less intelligent." She also stated that the family "knew something was wrong with him" but "didn't talk about it," that she "always knew that [he] would hurt somebody," and that "he couldn't get along with anybody." His mother explained that Brookins "started having problems . . . in kindergarten" and had to repeat it because he was deemed "immature"; that, "as things progressed in school, he was

17

referred to special ed"; that he repeated third grade because of problems with his "reading comprehension skills"; and that "[h]is problems really started once he reached about adolescence." She explained that "he was overly aggressive" and that she would "sometimes . . . wonder how [his brother] would survive him" and would have to punish him for "hurting" his brother. She attributed "a lot of his problems to being incarcerated so much, because every time he would go in and he would come out, he would be worse," to the point that he became "disrespectful" and "verbally abusive" toward her and her husband and would have "more problems getting along with people" generally. She explained that she and Suzanne Brookins, the adult victim, both believed that he might do better if he found the right medication and took it regularly, and she found him to be "calm" and "rational" since he had been jailed and presumably had been taking the right medication. She stated that, prior to the murder, Suzanne Brookins's "family didn't want her with him anymore" because "[t]hey realized that he could be a danger."

As a rebuttal witness, the State presented testimony from the radiologist at Central State Hospital who had interpreted Brookins's x-rays and MRI scans. He described an "incidental finding of spina bifida occulta," which he described as "a failure of closure of the spine at the very bottom part of it," as "a very common congenital anomaly" that he sees "often," and as something that would not have affected brain development. He explained that he found Brookins's MRI to be "within the limits of normal" and that he "saw no evidence of trauma" to the brain, saw no shrinkage of any part of the brain, saw no reduction in blood flow or volume to any part of the brain, saw no evidence of stroke or stroke-like symptoms, saw no premature aging or deterioration, and saw no evidence of any other chronic problem that might have affected the brain. He acknowledged that he saw two white dots on one of the MRI images, but he opined that "they're not in the frontal lobe at all" but instead were "within the spinal fluid part of the brain . . . in the frontal horn of the lateral ventricle."

The State's rebuttal witnesses also included testimony from the owner of a used car store who had employed Brookins as a mechanic for about three months and had found him to be as capable as his other mechanics. The State presented testimony from a jail nurse who explained that Brookins had not been allowed to take his personal Xanax during his three-week incarceration because of the addictive nature of that drug, that he was provided other medications deemed suitable that he took at all but three scheduled times, and that his personal medications were returned to him on the day after his release on bond. She also testified that she observed no symptoms like those that she had observed in intellectually disabled or mentally ill persons. The State presented testimony from Brookins's first, sixth, seventh, and eighth grade teachers, who explained that he had attention problems, was enrolled in a special education resource program but solely for his language arts skills, and did not exhibit signs of intellectual disability or mental illness.

The State presented further rebuttal testimony from the

neurologist at Central State Hospital, who explained that he found in Brookins no lapses of memory, no defect in reasoning, no defect in the peripheral nervous system, no evidence of brain damage, and no other abnormalities. The State presented testimony from a diagnostic counselor who explained that Brookins could not have been admitted to the custodial boot camp program where she worked if he had "any mental health program" and that she had seen no signs in him of intellectual disability or mental illness. Next, the "diagnostic unit manager at Baldwin State Prison" explained that Brookins had been diagnosed with Bipolar Disorder one time but had been diagnosed four other times without it, explained the results of his various academic assessments, and testified that Brookins's IQ scores from his various incarcerations had ranged from 94 to 105, albeit on the Culture Fair test that was only used to make a "ballpark" assessment. Finally, the State's rebuttal case included testimony from a jail administrator that, during five months of observing Brookins, he had seen him programming a remote control for a new television, acting as the "banker" in

21

frequent games of "Monopoly," helping other inmates fill out forms for the jail store, playing a card game that appeared to be poker, and aptly advising a deputy on how to weld a basketball hoop.

The defense recalled two of its original witnesses in response to the State's rebuttal case. The defense psychologist explained that the Culture Fair test was not "an individually administered IQ test," that it had been modified to be more suitable to "rehabilitation settings," and that it "was submitted to a whole new scoring system that's about 30 to 40 points higher than real IQ tests." And, finally, the defense's neuropsychiatrist was recalled to the stand and testified that it was "ludicrous" for the State's radiologist to conclude that there was no scarring of the brain visible on Brookins's MRI and that he was "stunned and shocked" that the State's radiologist had asserted that the white areas on the MRI were not located in the frontal lobe. He asserted instead that the white areas were "abnormal," "should not have been there at [Brookins's] age," were actually "capping on the tips of the fluid filled spaces in the frontal lobe," and could not be "brain fluid."

(c) Upon our review of the record and upon our consideration of Brookins's arguments regarding his alleged "mental retardation" and "mental illness," we conclude that the evidence presented in the guilt/innocence phase was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Brookins was guilty of the charges of which he was convicted and to decline to find[4] that he was "mentally retarded" or "mentally ill." See *Jackson v. Virginia*,

---

[4] The trial court acknowledged that the statutorily prescribed burden of proof for "mental retardation" and "mental illness" claims rests on defendants under the beyond a reasonable doubt standard. See *Young v. State*, 312 Ga. 71, 88 (25) (b) n.9 (860 SE2d 746) (2021) (plurality opinion), cert. denied, __ U. S. __ (142 SCt 1206, 212 LE2d 215) (2022). However, the trial court allowed the parties to mutually consent to the jury's being charged that the burden rested on Brookins under merely a preponderance of the evidence standard. It might be understandable for the State and the trial court to have hoped to exercise, as the State described it, "an abundance of caution" as to the standard of proof in light of the arguments afoot at the time suggesting that the statutorily prescribed standard was unconstitutional. See id. at 128 ("[W]hen we enter the realm of Eighth Amendment 'evolving standards of decency,' if there is not a holding from a United States Supreme Court case directly on point, a lower court trying to understand what validly enacted state laws that Court will decide the United States Constitution has morphed to nullify must guess about what the majority of Justices currently serving on that Court will decide when a particular new issue is presented to them." (Nahmias, P. J., concurring specially)). However, we note that this Court has yet again definitively resolved such claims in favor of the General Assembly's chosen standard, and we expect that standard to be followed in future trials. See id. at 87 (25) (plurality opinion in an 8-to-1 decision to affirm) ("Seeing no clear direction in the law to hold otherwise, we adhere to our prior decisions upholding Georgia's standard of proof.").

443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (providing the constitutional standard for the review of the sufficiency of the evidence of a crime); *King v. State*, 273 Ga. 258, 259 (1) (539 SE2d 783) (2000) (reviewing the sufficiency of the evidence regarding alleged intellectual disability); UAP Rule IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence).

### *Issues Related to the Guilt/Innocence Phase*

2. Brookins argues that the sheriff of Baldwin County impermissibly served both as a key witness and as a caretaker of the jury in violation of his constitutional rights to an impartial jury and to a fair trial. See *Turner v. Louisiana*, 379 U. S. 466, 471-474 (85 SCt 546, 13 LE2d 424) (1965) (concluding that a constitutional violation occurred where a trial court overruled a defendant's objection to testimony by two deputies who also served as bailiffs). We conclude that there is no reversible error as to this claim.

The record shows that throughout Brookins's trial the sheriff of Baldwin County was responsible, at least ultimately, for

24

arranging the jurors' transportation, for arranging their meals, and for logistical matters such as their access to telephones, televisions, and computers. To no one's surprise, the sheriff was called to testify; however, Brookins raised no objection at trial to his testimony or to his service with regard to the care of the jury.[5] The sheriff's testimony was largely focused on the details of the standoff with Brookins at his parents' house, where he threatened suicide but eventually surrendered. The sheriff, who knew both the victims and Brookins, also gave two responses indicating that Brookins had appeared coherent and lucid in the sheriff's past conversations with him and that the sheriff "never had a problem communicating with him." Because Brookins failed to raise an objection as to this issue, it is waived for the purposes of ordinary appellate review. See *Martin v. State*, 298 Ga. 259, 278-279 (6) (d) (779 SE2d 342) (2015), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706

---

[5] We note that, in response to Brookins's motion for an "impartial witness monitor," the State agreed that bailiffs in plain clothes and not sworn sheriff's deputies would monitor the *witnesses*. However, we do not regard this motion as constituting any objection to the sheriff's testimony or his role in caring for the *jury*.

(11) (a) n.3 (820 SE2d 640) (2018); *Hudson v. State*, 250 Ga. 479, 484-485 (5) (299 SE2d 531) (1983) (determining that no reversible error existed where no objection was made to the trial court's "sending the jury to lunch with the sheriff"). Furthermore, in light of Brookins's clear position at trial that he was not contesting his guilt and in light of the limited nature of the sheriff's testimony about his ability to communicate with Brookins, we conclude that this claim does not change our analysis in our Sentence Review below. See *Martin*, 298 Ga. at 279 (6) (d) ("That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence."). See *Bass v. State*, 285 Ga. 89, 93 (674 SE2d 255) (2009) ("*Under the circumstances in this case*, we conclude there is a reasonable probability that the outcome of the trial would have been different if defense counsel had objected to the trial court's decision to allow Wilson, a key prosecution witness, to serve as bailiff." (emphasis supplied)).

3. Brookins argues that the trial court impermissibly allowed

26

testimony about his attempt to purchase an assault rifle on the day of the murders.  We disagree.

The State presented testimony from the co-owner of a pawn shop explaining that, between 1:00 p.m. and 3:00 p.m. on the day of the murders, Brookins entered the shop and "asked if [they] had any AKs or SKSs."  She further explained that Brookins claimed that he was planning to use such an assault weapon for deer hunting and stated that, "if you use the right ammunition, you know that when you hit it, it's going to hit the ground."  When Brookins objected to the State's plan to show a similar weapon to the witness and the trial court expressed an inclination to grant the motion, the State agreed not to do so.

Later, when Brookins noted that the assault weapon was still in the courtroom, the State agreed to remove it.[6]  Later still, the State asked its firearms expert about the bulletproof vests typically worn by police officers, and the expert explained that an "AK or

---

[6] It is unclear from the record whether the assault rifle was visible to the jury.

SKS" would be capable of "go[ing] through a bullet proof vest with great ease."  The State also presented testimony from other witnesses showing that Brookins had a history of personal conflict with Suzanne Brookins's brother, who was an officer with the sheriff's office, and testimony from one of Brookins's jail mates claiming that Brookins had stated that he was going to kill Suzanne Brookins's "whole family" and that Brookins had "mentioned high hatred for [her brother]," which connected the testimony about how an assault rifle can pierce the bulletproof vest of a police officer specifically to one of Brookins's intended victims.

Given how the testimony regarding Brookins's attempt to purchase an "AK or SKS" assault rifle directly related to the other evidence of his motives and preparation for the murders, we conclude, contrary to Brookins's argument, that the testimony at issue here was not irrelevant.  See *Payne v. State*, 273 Ga. 317, 318 (3) (540 SE2d 191) (2001) ("The trial court correctly denied this motion [for a mistrial] because the evidence was admissible as part of the res gestae of the murder, and was also relevant to the

28

existence of a motive for that crime."); cf. *Nichols v. State*, 282 Ga. 401, 403 (2) (651 SE2d 15) (2007) (holding that it was error to admit similar evidence where the evidence was "irrelevant" to the defendant's alleged crimes).

4. The trial court did not err by trying the issue of Brookins's alleged intellectual disability during the guilt/innocence phase. See *King*, 273 Ga. at 272 (27) (citing *Palmer v. State*, 271 Ga. 234, 237 (3) (517 SE2d 502) (1999)). See also *Livingston v. State*, 264 Ga. 402, 406 (3) (444 SE2d 748) (1994) ("While there may be advantages to a criminal defendant in having a trial apart from the guilt-innocence phase on the issue of mental retardation, such a change must come from the General Assembly.").

5. Brookins argues that, in the guilt/innocence phase, the State made improper comments in its opening statement and asked improper questions to witnesses concerning his mental condition. Specifically, he argues that the State's opening statement, questions to witnesses, and closing argument impermissibly conflated the issue of "mental illness," which was part of a verdict that he *was*

29

seeking, with the issue of "insanity," which he was *not* alleging.  For example, the State mentioned in its opening statement that the mental health evidence would not prove "that [Brookins] did not know right from wrong" or was "acting under any delusion or compulsion that over-masked [sic] his will."

The terms "mentally ill" and "insane" as defined in Georgia law overlap significantly in meaning.  The Code provides the following definition for "mentally ill":

> "Mentally ill" means having a disorder of thought or mood which *significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life*.  However, the term "mental illness" shall not include a mental state manifested only by repeated unlawful or antisocial conduct.

OCGA § 17-7-131 (a) (3) (as renumbered by Ga. L. 2017, p. 471, § 3) (emphasis supplied).  As to "insanity," the Code provides two definitions that will support a verdict of "not guilty by reason of insanity."  In the first, the definition is met where "the person *did not have mental capacity to distinguish between right and wrong* in relation to [an otherwise-criminal act]."  OCGA § 16-3-2 (emphasis

supplied).  In the second, the definition is met where "the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a *delusional compulsion* as to such act *which overmastered his will* to resist committing the crime."  OCGA § 16-3-3 (emphasis supplied).  Much of the controversy in Brookins's case should be understood in relation to this overlap of meanings.  Clearly, every person who fits one of the two legal definitions of "insanity" would *also* qualify as "mentally ill" under the law.  But the reverse is *not* true, as not every person who is "mentally ill" can meet one of the two narrower definitions of "insanity."  See *Boswell v. State*, 275 Ga. 689, 690 (1) (572 SE2d 565) (2002) ("A defendant who is not insane may nonetheless be found guilty but mentally ill. . . .").  Thus, we have held that the distinction between these two definitions must be made clear in the charges to the jury when both are at issue in the case.  See *Keener v. State*, 254 Ga. 699, 702-703 (2) (334 SE2d 175) (1985).  Likewise, we hold here that parties' statements and questions that suggest that a defendant must fit the definition of "insanity" in order to be found "mentally ill" are

31

objectionable.

In Brookins's case, some of the State's statements and questions complained about on appeal were plainly *not* objectionable, as issues such as whether Brookins had "a self-control problem" or "[didn't] understand the reality the rest of us live in" were directly relevant to whether he had "a disorder of thought or mood which *significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life.*" OCGA § 17-7-131 (a) (3) (as renumbered by Ga. L. 2017, p. 471, § 3) (emphasis supplied). See *Jenkins v. State*, 269 Ga. 282, 292 (16) (498 SE2d 502) (1998) (holding that "the prosecutor's use of the term 'competence' and references to [the defendant's] ability to distinguish right and wrong . . . were not designed to confuse the jury but were part of the prosecutor's overall argument that [the defendant's] conduct evidenced a mental capability inconsistent with mental retardation"). However, we conclude that some statements and questions by the State, such as those incorporating the phrases "criminal responsibility" and "overmastering of the

32

will," would have been somewhat confusing to the jurors as to what it would eventually be called upon to decide under the *proper* definition of "mental illness" that the trial court eventually provided to them.

As to the one instance of such improper questioning about which Brookins has shown that he objected at trial, which involved the phrases "criminal responsibility" and "overmaster[ing] his ability to control himself," we hold that the improper questioning does not require a new trial, as it is highly probable that it did not contribute to the guilt/innocence or sentencing phase verdicts. See *Johnson v. State*, 238 Ga. 59, 61 (230 SEd 869) (1976) (adopting the "highly probable" test of harmlessness for non-constitutional errors).[7] As to the remaining instances where *no* objection was

---

[7] Regarding the "highly probable" test for the harmlessness of non-constitutional error, we note that a number of decisions have equated that standard with the "reasonable probability of a different outcome" standard. However, we note that those decisions, when traced to their origin in a single opinion by the Court of Appeals in *Berry v. State*, 210 Ga. App. 789, 791 (3) (437 SE2d 630) (1993), adopted language from the field of ineffective assistance of counsel without a discussion in *any* of them of why doing so was warranted or advisable. See *Nichols*, 282 Ga. at 405 (2) (citing *Belmar v. State*, 279 Ga. 795, 800 (3) (621 SE2d 441) (2005)); *Morris v. State*, 280 Ga. 179, 180 (3) (a)

(626 SE2d 123) (2006) (citing *Felder v. State*, 270 Ga. 641, 646 (8) (514 SE2d 416) (1999)); *Belmar*, 279 Ga. at 800 (3) (citing *Felder v. State*, 266 Ga. 574, 576 (468 SE2d 769) (1996)); *London v. State*, 274 Ga. 91, 94 (4) (c) (549 SE2d 394) (2001) (citing *Felder*, 266 Ga. at 576); *Felder*, 266 Ga. at 576 (2) (citing *Berry*, 210 Ga. App. at 791 (3)); *Hahn v. State*, 356 Ga. App. 79, 81 (1) (846 SE2d 258) (2020) (citing *King v. State*, 346 Ga. App. 362, 369-370 (1) (816 SE2d 390) (2018)); *Maqrouf v. State*, 349 Ga. App. 174, 180 (1) (b) & n.19 (825 SE2d 569) (2019) (citing *Sanchez-Villa v. State*, 341 Ga. App. 264, 273 (1) (b) (799 SE2d 364) (2017)), overruled on other grounds by *Flowers v. State*, 307 Ga. 618, 621 (2) n.3 (837 SE2d 824) (2020); *Sanchez-Villa*, 341 Ga. App. at 273 (1) (b) (citing *Lowther v. State*, 263 Ga. App. 282, 283 (1) (587 SE2d 335) (2003)); *King*, 346 Ga. App. at 369-370 & n.18 (citing *Gaskin v. State*, 334 Ga. App. 758, 763 (1) (b) (780 SE2d 426) (2015)); *Douglas v. State*, 340 Ga. App. 168, 174 (2) & n.20 (796 SE2d 893) (2017) (citing *Gaskin*, 334 Ga. App. at 761 (1) (a)); *Grier v. State*, 339 Ga. App. 778, 787 (5) (792 SE2d 737) (2016) (citing *Lowther*, 263 Ga. App. at 283 (1)); *Gaskin*, 334 Ga. App. at 763-764 (1) (b) (citing *Leverette v. State*, 303 Ga. App. 849, 852 (2) (696 SE2d 62) (2010)); *Goolsby v. State*, 311 Ga. App. 650, 656 (3) (718 SE2d 9) (2011) (citing *Dixon v. State*, 303 Ga. App. 517, 521 (2) (693 SE2d 900) (2010)); *Hughes v. State*, 309 Ga. App. 150, 154 (2) (709 SE2d 900) (2011) (citing *Leverette*, 303 Ga. App. at 851 (2)); *Robinson v. State*, 308 Ga. App. 562, 568 (1) & n.20 (708 SE2d 303) (2011) (citing *Gresham v. State*, 281 Ga. App. 116, 119 (635 SE2d 316) (2006)); *Williams v. State*, 307 Ga. App. 675, 679 (2) & n.10 (705 SE2d 906) (2011) (citing *Shirley v. State*, 259 Ga. App. 503, 505 (578 SE2d 163) (2003)); *Leverette*, 303 Ga. App. at 852 (2) & n.15 (citing *Abernathy v. State*, 299 Ga. App. 897, 902 (2) (685 SE2d 734) (2009)); *Dixon*, 303 Ga. App. at 520-521 (2) & n.17 (citing *Shirley*, 259 Ga. App. at 505); *Abernathy*, 299 Ga. App. at 902 (2) & n.19 (citing *Shirley*, 259 Ga. App. at 505); *Adams v. State*, 284 Ga. App. 534, 541 (3) & n.42 (644 SE2d 426) (2007) (citing *Felder*, 266 Ga. at 576 (2)); *Gresham*, 281 Ga. App. at 119 & n.15 (citing *Felder*, 266 Ga. at 576 (2)); *Phillips v. State*, 278 Ga. App. 439, 441 (1) & n.4 (629 SE2d 130) (2006) (citing *London*, 274 Ga. at 94-95 (4) (c) and *Felder*, 266 Ga. at 576 (2)); *Lowther*, 263 Ga. App. at 283 (1) (citing *Berry*, 210 Ga. App. at 791 (3)); *Shirley*, 259 Ga. App. at 505 & n.2 (citing *Key v. State*, 226 Ga. App. 240, 242 (1) (485 SE2d 804) (1997)); *Hayward v. State*, 258 Ga. App. 566, 568 (1) (b) & n.6 (574 SE2d 646) (2002) (citing *Felder*, 266 Ga. at 576 (2)); *Clark v. State*, 248 Ga. App. 88, 90-91 (2) (545 SE2d 637) (2001) (citing *Felder*, 266 Ga. at 576 (2)); *Key*, 226 Ga. App. at 242 (1) (citing *Felder*, 266 Ga. at 576); *Berry*, 210 Ga. App. at 791 (3) (citing *Hite v. State*, 208 Ga. App. 267, 270 (2) (430 SE2d 125) (1993)), disapproved on other grounds by *State v. Burns*, 306 Ga.

raised, we hold that Brookins's claims are waived for the purposes of ordinary appellate review. See *Martin*, 298 Ga. at 278-279 (6) (d). Nevertheless, we consider Brookins's arguments in our Sentence Review below. See id. at 279 (6) (d) ("That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence.").

6. Brookins argues that it was error for the trial court to permit the State to present evidence against a possible finding of

---

117, 124 (2) n.3 (829 SE2d 367) (2019); *Hite*, 208 Ga. App. at 269-270 (1)-(2) (assuming an error to be of constitutional magnitude, concluding that the error was harmless beyond a reasonable doubt, and *then* deciding a related *ineffective assistance of counsel claim* under the reasonable probability of a different outcome standard). However, more recently this Court has treated the two tests as being distinct, particularly when any difference between them might matter. See *Harris v. State*, 313 Ga. 872, 882 (4) (874 SE2d 73) (2022) (addressing the two standards side-by-side); *State v. Lane*, 308 Ga. 10, 21-22 (4) (838 SE2d 808) (2020) (noting the two different standards but noting that "in most cases a difference in the standards will not make a difference in the result"); *Boatright v. State*, 289 Ga. 597, 601-602 (7) (713 SE2d 829) (2011) (addressing the two standards side-by-side); *Felton v. State*, 283 Ga. 242, 246-247 (2) (d) (657 SE2d 850) (2008) (addressing the two standards side-by-side). See also *Hilliard v. State*, 226 Ga. App. 478, 482 (1) (487 SE2d 81) (1997) (describing the two standards as "similar"). Nevertheless, we need not resolve here the question of whether the two standards are equivalent, because we conclude that the error at issue in Brookins's case would be harmless under either standard.

intellectual disability or mental illness in its case-in-chief in the guilt/innocence phase rather than only in rebuttal to evidence first presented by him in favor of such a finding. However, relying on Uniform Superior Court Rule 10.2, this Court has held that the State is entitled to present its case for such verdicts first. See *Stripling v. State*, 289 Ga. 370, 375 (2) (711 SE2d 665) (2011) (holding regarding evidence against a possible finding of intellectual disability that "the rule clearly contemplates that the State will be entitled to present its evidence before [the defendant] presents his [or her] evidence"), disapproved on other grounds by *Young v. State*, 312 Ga. 71, 91 (25) (c) (i) (860 SE2d 746) (2021) (plurality opinion). Brookins argues that a different rule should apply because the State is entitled to present expert mental health testimony only if the defense first presents its own. First, this argument is overly broad, as it seems to encompass *all* expert mental health testimony, whereas the general rule about the State's use of expert mental health testimony only in rebuttal to the defense's own use of such testimony is premised on whether the State's expert has evaluated

36

the defendant in a manner that implicates his or her constitutional right to remain silent. See *Nance v. State*, 272 Ga. 217, 219-220 (2) (526 SE2d 560) (2000) ("[T]he purpose of the rule requiring the defendant to submit to a State mental health examination under these circumstances is to permit the State to formulate a response or a rebuttal to the testimony of the defendant's mental health expert. . . ."); *Abernathy v. State*, 265 Ga. 754, 754-755 (2) (462 SE2d 615) (1995). Second, to the extent that Brookins's argument applies to expert mental health testimony that *does* implicate the constitutional right to silence, we hold that that right is sufficiently protected when, upon request by the defendant, such testimony from the State is not presented until "an announcement by the defendant that he [or she] intends to present expert mental health testimony" of his or her own at trial. *State v. Johnson*, 276 Ga. 78, 80-81 (3) (576 SE2d 831) (2003) (addressing whether and for how long to seal the evaluation of the State's mental health expert). Thus, pretermitting Brookins's failure to raise a related objection at trial, we conclude that there is no error here.

7.  Brookins argues that the State and its expert witnesses repeatedly mischaracterized the definition of intellectual disability, the abilities of some intellectually disabled persons, and the import of a person's having some behavioral strengths while still having some weaknesses.  We conclude that no objections by Brookins were erroneously overruled on these points, because the testimony, arguments to the jury, and charges to the jury that Brookins discusses on appeal, as ultimately expressed and in context, were compatible with the Georgia Code, this Court's precedents, and the precedents of the United States Supreme Court.  See OCGA § 17-7-131 (a) (3) (defining "mentally retarded" prior to an amendment in 2017 that adopted the term "intellectual disability" and renumbered paragraphs); OCGA § 17-7-131 (a) (2) (defining "intellectual disability" since the amendment in 2017 by Ga. L. 2017, p 471, § 3); *Moore v. Texas*, 581 U. S. 1, 7 (I) (137 SCt 1039, 197 LE2d 416) (2017) (describing the "generally accepted, uncontroversial intellectual-disability diagnostic definition" and noting that the definition "identifies three core elements:  (1) intellectual-functioning deficits

38

(indicated by an IQ score approximately two standard deviations below the mean — i.e., a score of roughly 70 — adjusted for the standard error of measurement); (2) adaptive deficits (the inability to learn basic skills and adjust behavior to changing circumstances); and (3) the onset of these deficits while still a minor." (citations and punctuation omitted)); *Stripling v. State*, 261 Ga. 1, 4 (3) (b) (401 SE2d 500) (1991). See also *Young*, 312 Ga. at 91 (25) (c) (i) (plurality opinion) ("On this point, we emphasize that Georgia, by statute and through case law, has always applied such prevailing clinical standards.").

8. Brookins argues that the trial court erred by qualifying his former school psychologist as an expert witness for the State. The school psychologist explained during his voir dire that he held a master's degree in educational psychology, had completed everything but the dissertation for a PhD, had worked as a child psychologist for 30 years, had evaluated about 10,000 students, did not hold a license as a psychologist but did hold a certificate from the State Department of Education in school psychology, did not

need any further credentials to serve as a school psychologist, and was qualified to conduct evaluations for potential intellectual disability and for students with "academic, learning, behavioral, [and] emotional" difficulties. The trial court did not abuse its discretion in finding him qualified as an expert witness. See former OCGA § 24-9-67 (renumbered in 2011 as OCGA § 24-7-707, repealed by Ga. L. 2022, pp. 201, 202, § 2) ("In criminal cases, the opinions of experts on any question of science, skill, trade, or like questions shall always be admissible. . . ."); *Adams v. State*, 275 Ga. 867, 868 (3) (572 SE2d 545) (2002) ("The trial court excluded this [expert] testimony because whether Adams had a mental disorder was a medical opinion, only doctors can give medical opinions, and [the proposed expert] was not a doctor. This ruling was error. . . . The fact that she did not hold a medical degree goes only to the weight the jury may give her testimony.").

9. Brookins argues that Dr. Katherine Jacoby, a psychiatrist who testified for the State, was improperly permitted to "guess" at what Brookins's IQ was. The psychiatrist was qualified as an expert

witness without any objection by Brookins, as was Dr. Scott Smith, a psychologist who also testified for the State and who had worked with Dr. Jacoby as a team in conducting an evaluation of Brookins. Indeed, the record shows that both witnesses were amply qualified to give expert testimony about Brookins's alleged intellectual disability and mental illness. Dr. Jacoby explained that she and Dr. Smith examined Brookins's medical records, spoke to Brookins's family, spoke with Brookins for over 14 hours, performed psychological tests, reviewed legal documents regarding the murders and past domestic violence, read witness forms regarding the murders, reviewed video recordings of Brookins from after the murders, examined prior psychological evaluations for disability benefits, examined jail records, and reviewed the results from an EEG and an MRI. Although, as shown by his later testimony, Dr. Smith had administered a test for malingering of memory skills that had provided no "specific signs" of malingering as to cognitive impairment, Dr. Smith added that he could not "say definitively that [Brookins] did his best and was not malingering" on his IQ test.

41

Furthermore, Dr. Jacoby's diagnoses included findings that Brookins *had been* "malingering" or "making up" symptoms of psychosis and dissociation, and she explained that, "[i]f someone is malingering one issue, you have to look very carefully at all the other issues that they're complaining of and . . . see if they're malingering those as well."

When Dr. Jacoby explained that testing by Dr. Smith had yielded an IQ score of 72, the State asked her whether she was "surprised at that number based on what [she] had seen from" Brookins, and she answered, "Yes, I was." The State followed up by asking, "What did you expect, based on your history with him?" She answered, "I expected probably mid-80s." Then she answered affirmatively when the State asked whether, "after 14 hours of talking with him, [she had] expected him to be somewhere in the mid-80s." Brookins objected, arguing that such testimony would be "speculation," that "Dr. Smith [rather than Dr. Jacoby] did the IQ evaluation," and that Dr. Jacoby was "not even qualified to give IQ evaluations." Pretermitting the arguable question of whether the

testimony was "speculative" or, as Brookins argues the point on appeal, mere "guessing," and pretermitting also Brookins's argument on appeal that Dr. Jacoby's testimony did not satisfy the requirements for expert testimony that applied in criminal proceedings at the time of his trial, we hold that any error in admitting the testimony was harmless in that "it is highly probable that the error did not contribute to the verdict." *Sanders v. State*, 251 Ga. 70, 76 (3) (303 SE2d 13) (1983) (addressing expert testimony). We reach this conclusion in light of the fact that Dr. Jacoby was willing to assume the validity of Brookins's tested IQ score of 72 while nevertheless remaining confident that he was not intellectually disabled, along with our consideration of the overall strength of the State's evidence and the weakness of Brookins's evidence as outlined in some detail in Division 1 (b). See *Felder v. State*, 270 Ga. 641, 645 (7) (514 SE2d 416) (1999) (noting that contested testimony was "based upon [the witness's] own personal observations and training"); *Burgess v. Commr. of Alabama Dept. of Corrections*, 723 F3d 1308, 1316 (II) (A) (11th Cir. 2013) (rejecting

as unreasonable a state-court finding of no intellectual disability where the finding was based on an "estimate" of the defendant's IQ, where "there was no evidence introduced as to how this *estimate* was obtained" and where the expert who had reportedly reached the estimate also expressed the view that the defendant "may even be mildly mentally retarded" (emphasis in original)). See also *Hamilton v. State*, 309 Ga. 1, 7-8 (3) (843 SE2d 840) (2020) (applying *Harper v. State*, 249 Ga. 519 (292 SE2d 389) (1982), which governed expert testimony in criminal cases prior to July 1, 2022); OCGA § 24-7-702 (as amended by Ga. L. 2022, p. 201, § 1, to apply "in all proceedings" rather than only "in all civil proceedings").

10. Brookins argues that, in a number of instances, lay witnesses were improperly asked to opine as to whether Brookins was intellectually disabled and to rely on lay stereotypes about intellectual disability. This claim has not been preserved for the purposes of ordinary appellate review, because no objection was raised to the State's contested questions to these witnesses, at least not after the State was permitted to reformulate its questions after

44

some initial objections. See *Martin*, 298 Ga. at 278-279 (6) (d). Nevertheless, we consider Brookins's argument in our Sentence Review below. See id. at 279 (6) (d) ("That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence."). See also *Rogers v. State*, 282 Ga. 659, 667-668 (10) (653 SE2d 31) (2007) (holding that lay testimony regarding a defendant's "behavior . . . was relevant to the issue of [the defendant's] adaptive skills . . . and was not unduly prejudicial because the [lay witness] clarified that he was not diagnosing anyone"), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 23 (Appendix) (838 SE2d 808) (2020).

11. As noted above in our review of the evidence presented in the guilt/innocence phase, a neuropsychiatrist testified on direct examination by the defense that Brookins's MRI from Central State Hospital showed damage to brain tissue in the frontal lobe, the State presented testimony from the radiologist at Central State Hospital who had originally interpreted the MRI insisting that there was no

evidence of brain damage shown by it, and the defense then recalled its neuropsychiatrist to respond. The defense neuropsychiatrist, Dr. Thomas Sachy, stated that he was "stunned and shocked" by the testimony of the State's radiologist, which he described as "ludicrous." Dr. Sachy further stated, "I'm upset when someone — and I've seen this before, especially for prosecution witnesses, to say that things that are plainly evident — that the evidence that is evident is not so." Dr. Sachy also decried how he had been "discouraged" from obtaining MRIs for patients when he previously worked for the State.

The State then asked Dr. Sachy about his current medical practice, including whether he currently "prescribe[d] medication such as benzodiazepines," and continued by questioning Dr. Sachy about an investigation regarding his alleged practice of "backdating and hoarding prescriptions allegedly taken from [his] patients at [his] house." Dr. Sachy responded by stating that he was involved in an acrimonious divorce; that the allegations against him were by his wife; that evidence had arisen about his wife being involved in

forgery of court documents related to his daughter's last name; that he believed that his claim of forgery against his wife had been "covered up" by "the District Attorney of this Circuit"; that he had a recording of an investigator making a statement regarding his wife, who was a medical examiner for the State, that the prosecutors "do not go after people of her stature for things like this." Dr. Sachy also claimed that his wife was involved in "coverups made in the autopsies of people who may have been killed by law enforcement officers" and stated that he was upset about "the veracity and integrity of the GBI" and about how the sheriff's offices in Jones and Bibb counties had refused to pursue the matter.

After the State confirmed with Dr. Sachy that he had been cleared of the accusations regarding his prescribing practices, the State began asking him about the allegation that he had threatened his father-in-law verbally and with his foot or fist. Brookins objected at this point, arguing that the line of questioning was not relevant to Dr. Sachy's expert testimony and was "not proper impeachment." The State responded that it was seeking to show that Dr. Sachy had

47

"a bias and a leaning which [was] clearly pro-defense, anti-state," and it later added a comment about a "greater cogency" of such testimony in "a case of domestic violence." The trial court, without explaining its ruling in detail, ruled that the line of questioning was "proper," and Dr. Sachy's cross-examination about his contentious divorce continued for quite some time, with the State recounting his wife's allegations and with him responding with his own accusations against his wife and her parents. Then, Brookins objected again, this time arguing that the State had already covered the issue of possible bias; however, the trial court denied this second objection. In response to some of the continued questioning, Dr. Sachy stated, "This District Attorney's Office hasn't investigated the other side, but I have." This continued questioning even included a reference to an allegation of child molestation against Dr. Sachy by his wife, which the State noted had not resulted in any charges. The State then asked Dr. Sachy directly whether he could "be completely unbiased on a case where a man is accused of domestic violence."

Although this is a close question, we hold that the trial court

did not abuse its discretion in denying Brookins's objections to the State's cross-examination of Dr. Sachy about his having been investigated based on allegations made by his wife during their divorce, about the alleged unwillingness of investigators or the District Attorney to follow up on allegations regarding his wife's falsely testifying in unrelated criminal cases, about law enforcement officers' and the District Attorney's alleged unwillingness to pursue accusations that Dr. Sachy had himself made against his wife, and about Dr. Sachy's anger about these intertwined situations and any bias against the State resulting from them, because we conclude that the cross-examination was sufficiently relevant to the issue of Dr. Sachy's admitted bias against the State. See *Lee v. State*, 306 Ga. 663, 668-669 (4) (832 SE2d 851) (2019) (concluding that the trial court did not abuse its discretion in allowing cross-examination by the State about pending criminal charges against a witness who might have "reason to try to wound the State by shading his testimony"); *Watkins v. State*, 276 Ga. 578, 580-581 (3) (581 SE2d 23) (2003) (holding that "a witness cannot be impeached by instances

49

of specific misconduct unless that misconduct has resulted in the conviction of a crime involving moral turpitude" but further holding that a witness may still be examined as to any potential bias, including any stemming from the pending charges); *Hines v. State*, 249 Ga. 257, 260 (2) (290 SE2d 911) (1982) ("The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to the issues or personalities in the case at hand."). Cf. *Merritt v. State*, 311 Ga. 875, 880-881 (3) (a) (i) (860 SE2d 455) (2021) (noting that the relevant law was the same before and after the enactment of Georgia's current Evidence Code and holding: "Accordingly, the minimal probative value of the evidence was substantially outweighed by its unfair prejudicial effect; therefore, the trial court abused its discretion in allowing this testimony.").

12. Brookins claims that the State possessed investigative

50

reports from multiple state entities that would have shown that Dr. Sachy's wife's accusations against him were false, and he claims that the State failed to disclose those reports until years after Dr. Sachy's cross-examination. We reject each of Brookins's three arguments for why the State's actions might require a new trial.

(a) Brookins first argues that the State's failure to give the reports to him prior to Dr. Sachy's cross-examination violated his right to due process because those reports demonstrate that the prosecutor lacked a "good faith basis" for asking its cross-examination questions. See *Berger v. United States*, 295 U. S. 78, 88 (55 SCt 629, 79 LE 1314) (1935) ("He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones."). However, we conclude that, regardless of whether the accusations were accurate when they were originally made, the State had a good faith basis at trial for believing that the existence of the accusations themselves showed why Dr. Sachy harbored a bias against the State resulting from official investigations of him in connection with

51

prescriptions that he had written and from circumstances surrounding his divorce. Furthermore, the allegedly-suppressed records presented by Brookins do not show that the accusations against Dr. Sachy were untrue but instead show only that the investigations into them resulted in conclusions that the accusations were not compelling enough under the circumstances to be pursued by law enforcement or the medical board.

(b) Brookins next argues that the State's actions amounted to unconstitutional evidence suppression. See *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963). To succeed on this *Brady* claim, Brookins must satisfy four factors: (1) the State, including any part of the prosecution team, possessed evidence favorable to Brookins; (2) Brookins did not actually possess the favorable evidence and could not have obtained it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) a reasonable probability that the outcome of Brookins's trial would have been different if the evidence had been disclosed to him. See

*Schofield v. Palmer*, 279 Ga. 848, 852 (2) (621 SE2d 726) (2005).[8]

Upon our review of the record, we conclude that the trial court's findings of fact regarding this claim, which was also raised in Brookins's motion for a new trial, were not clearly erroneous. The trial court found that the prosecutor "advised [Brookins's counsel] of the contents of the reports" and even warned Brookins's counsel that, "if Dr. Sachy were called for additional testimony, that information would be used as potential impeachment evidence or evidence of Dr. Sachy's bias." Furthermore, in response to the claim by Brookins's counsel in an affidavit that he was *not* made aware of the allegations against Dr. Sachy contained in the allegedly-suppressed reports, the trial court found that, "while the documentation was not made available prior to the cross[-]examination, the substance of those allegations [was] provided to

---

[8] We decline Brookins's invitation to revisit our prior reasoning in applying this four-part test as a means of applying the original three-part test of *Brady*; that prior reasoning, if traced to its origin through our case law and then through that of the United States Court of Appeals for the Eleventh Circuit, was borrowed from various federal courts of appeals. See *Zant v. Moon*, 264 Ga. 93, 100 (3) (440 SE2d 657) (1994) (citing *United States v. Meros*, 866 F2d 1304, 1308 (II) (A) (1) (11th Cir. 1989)).

counsel." Finally, the trial court noted that "[n]othing prevented [Brookins] from asking Dr. Sachy about the potential impeachment or bias evidence," and Dr. Sachy was, we add, Brookins's *own* expert. Also, we further note that the prosecutor informed Brookins's counsel that he had just learned about the contents of the reports but did not yet have the actual reports, and yet Brookins took no actions to obtain a copy of them prior to calling Dr. Sachy back to the witness stand. Under all of these circumstances, we conclude that Brookins has failed to satisfy the second of the four factors set forth above, which requires him to show that he did not actually possess the favorable evidence at issue and could not have obtained it himself with reasonable diligence. See *Schofield*, 279 Ga. at 852 (2). Accordingly, Brookins's *Brady* claim fails.

(c) Finally, Brookins argues that the State violated its duty to disclose the reports at issue to him as part of discovery under OCGA § 17-16-4 (a) (3) (A) (creating a duty to disclose "documents . . . intended for use by the prosecuting attorney as evidence in the prosecution's case-in-chief or rebuttal"). Because Brookins failed to

54

make such an objection at trial, this claim is waived for the purposes of ordinary appellate review. See *Martin*, 298 Ga. at 278-279 (6) (d); *Danenberg v. State*, 291 Ga. 439, 442 (4) (729 SE2d 315) (2012) (addressing waiver of this particular issue). Nevertheless, we have considered Brookins's arguments throughout this enumeration of error concerning the allegedly-suppressed reports in our Sentence Review below. See *Martin*, 298 Ga. at 279 (6) (d) ("That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence.").

13. In accordance with OCGA § 17-7-131 (b) (3) (C) (as currently renumbered by Ga. L. 2017, p. 471, § 3), the trial court charged the jury that a verdict of "guilty but mentally retarded" would result in his being "placed in the custody of the Department of Corrections" with the Department's having "discretion" to make a "referral for temporary hospitalization at a facility operated by the Department of Human Resources." Pretermitting Brookins's failure to object, we note that this Court has previously denied relief under

a claim similar to the one that Brookins makes here, in which he contends that the jury would have been misled into believing that Brookins would not receive a life sentence upon a verdict of guilty but intellectually disabled. See *Young*, 312 Ga. at 114 (34) (plurality opinion).

14. As in the pattern jury charges, the trial court's instructions included a statement that the jury "would be authorized" to enter a verdict of "guilty but mentally retarded" upon the requisite findings for such a verdict. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.80.50. Because Brookins raised no objection to this instruction, which he had a significant role in preparing, it is subject to review only for whether there was plain error that affected substantial rights and then to further review as part of our Sentence Review below. See OCGA § 17-8-58 (b); *Martin*, 298 Ga. at 278-279 (6) (d). To show plain error, Brookins must show that (1) there was no affirmative waiver, (2) the error was obvious, (3) the instruction likely affected the outcome of the proceedings, and (4) the error seriously affected the fairness, integrity, or public reputation of the

judicial proceedings. See *Beasley v. State*, 305 Ga. 231, 236 (3) (824 SE2d 311) (2019). Pretermitting whether any error here was affirmatively waived or should have been obvious, we hold that any such error neither likely affected the outcome of his trial nor seriously affected the fairness, integrity, or public reputation of Brookins's trial. See *Young*, 312 Ga. at 116 (37) (plurality opinion) (rejecting a similar claim). See also *Woodard v. State*, 296 Ga. 803, 809 (3) (a) (771 SE2d 362) (2015) ("We note that whether a defendant's request that the trial court give a jury instruction is properly held to affirmatively waive all alleged errors regarding language included in or omitted from the instruction, or only errors regarding language that the record shows the defendant included or omitted after considering the controlling law, is a question that has divided the federal courts of appeals." (emphasis omitted)). We also consider this argument in our Sentence Review below. See *Martin*, 298 Ga. at 279 (6) (d) ("That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death

sentence.").

15. Pretermitting the fact that the claim was waived for the purposes of ordinary appellate review, we see no merit to Brookins's argument that the verdict form was insufficient to ensure a unanimous verdict as to the possible verdicts in the guilt/innocence phase of his case but instead allowed the jury to settle on a simple verdict of guilty as a compromise verdict. See *Young*, 312 Ga. at 115-116 (37) (plurality opinion) ("The charges, read as a whole, also made clear that *no* verdict could be reached and entered on the verdict form unless it was unanimous." (emphasis in original).

*Issues Related to the Sentencing Phase*

16. We reject Brookins's argument that persons with "mental illness" constitute a category of persons that, like intellectual disability, must be subject to a categorical exemption from death sentences. See *Lewis v. State*, 279 Ga. 756, 764 (12) (620 SE2d 778) (2005).

17. There is no merit to Brookins's contention that Georgia law fails to sufficiently narrow the class of persons eligible for the death

58

penalty. See *Ellington v. State*, 292 Ga. 109, 116 (3) (a) (735 SE2d 736) (2012), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3.

18. Georgia's death penalty statutes do not require that *non-statutory* aggravating circumstances be proven beyond a reasonable doubt, and they direct that this Court, rather than a jury, conduct proportionality reviews of all death sentences, while failing to prescribe a specific standard of proof for any alleged disproportionality. We reaffirm that these procedures are not unconstitutional. See *Ellington*, 292 Ga. at 116-117 (3) (d) (citing *Ring v. Arizona*, 536 U. S. 584, 609 (II) (122 SCt 2428, 153 LE2d 556) (2002)), overruled on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3.

19. Brookins's equal protection claim lacks merit because he has not shown any invidious discrimination in his case. See *Ellington*, 292 Ga. at 116 (3) (b), overruled on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3.

20. Brookins complains that a number of witnesses were

59

allowed to testify beyond what is allowed by the ordinary rules of evidence and even beyond the relaxed rules of evidence applied in the sentencing phase of a death penalty trial. While some of the testimony at issue appears not to have been properly shown by the State to be admissible, we note that the State *might* have been able to show its admissibility if Brookins had raised relevant objections at trial. Furthermore, we note that the core concerns raised in the testimony would have been successfully put before the jury in any case.

For example, one witness explained that she had been "best friends" with Brookins's ex-girlfriend and had personally witnessed "a lot of fights," including one where Brookins "physically started beating her" and only stopped when the witness "laid on top of her and dared him to hit [the witness]." She also testified that she was "a witness to" Brookins's telling the ex-girlfriend when she was pregnant with his son "that he would kill her if she had an abortion." When asked if she knew of any other incidents that made her believe that he might carry out his threat, she testified that she "didn't

witness" but "kn[e]w, being her best friend," that once "he took [his ex-girlfriend] out in a field and beat her and stripped her butt naked." Brookins raised no objection to the witness's lack of firsthand knowledge of the attack itself, and this failure to object was perhaps even intentional in light of the witness's involvement in searching for the ex-girlfriend and the risk that she might elaborate on otherwise-unknown details about the ex-girlfriend's physical condition upon being found.

In another example, the county solicitor general testified about her own experience with the mother of Brookins's son. While some of the incidental aspects of the solicitor general's testimony might have been inadmissible hearsay, the central portion involved a recounting of her own personal experience following a threat from Brookins, where his girlfriend was picked up and driven in a patrol car and where the courthouse was essentially locked down until he could be arrested.

Another witness, a probation officer, identified some of Brookins's certified court records and used them, along with his own

61

memories, to provide a history of Brookins's many probation violations. While some of the information provided by this witness beyond the certified court records appears to be hearsay, much of it was not, including the witness's own observation of cut-up clothing and a butcher knife when he responded to a call from Brookins's sister's roommate about him.

Another witness, a jail guard, relied on jail records to recount Brookins's disciplinary violations while in jail, including some unrevealed number of incidents that the witness had been personally involved in.

Brookins's argument also encompasses some clearly admissible testimony about his involvement in fights in middle school and high school, about his involvement in the theft of a motorcycle at the age of 15, about his involvement in stealing a car radio about 13 years prior to the trial, and his involvement, in an unspecified year, in a fight where "[e]verybody ran off in the bushes" when "everybody hollered cops."

Most of Brookins's arguments about the testimony at issue

62

here are unpersuasive, as "reliable evidence of bad character . . . is admissible in the sentencing phase of a death penalty trial." *Braley v. State*, 276 Ga. 47, 54 (34) (572 SE2d 583) (2002). We reject Brookins's argument that evidence regarding his youth was irrelevant, as the evidence tended to show the longstanding nature of his defects of character and tended to undercut his arguments that he had suffered a mental decline later in life. Finally, we note that any concern with the underlying reliability and admissibility of evidence is something that should be raised at trial, which Brookins failed to do in these instances and thereby waived any such arguments for the purposes of ordinary appellate review. See *Martin*, 298 Ga. at 278-279 (6) (d). Nevertheless, we have considered Brookins's arguments in our Sentence Review below. See id. at 279 (6) (d) ("That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence.").

21. Brookins contends that a number of arguments made by the State at the conclusion of the sentencing phase warrant a new

trial. We disagree.

(a) In his argument, the prosecutor laid out a number of categories of circumstances where a death sentence might *not* be warranted and explained as to each why Brookins did not fit into those categories; these categories were residual doubt, a troubled or impoverished family background, sexual or physical abuse, alcohol and drug problems, lack of a prior record, mental health problems, a lack of help from "the system," being a model inmate, and having remorse. Although, in introducing these categories of circumstances, the prosecutor described some of the facts that he had encountered in other cases that illustrated them, these descriptions were not so much "an invocation of prosecutorial expertise" as they were "an explanation of the state's reason" for seeking the death penalty. *Conklin v. State*, 254 Ga. 558, 573 (11) (331 SE2d 532) (1985) (declining to grant a new trial where "the prosecutor argued that [the] case was 'one of the most vile and brutal crimes to come about *in [the] county in recent memory*'" (emphasis in original)). While we have condemned "the injection into the argument of extrinsic and

prejudicial matters which have no basis in the evidence," the prosecutor here was doing the opposite of that: he was pointing out to the jury what was *not* in evidence by drawing contrasts with his descriptions of what the evidence *might* have been. (Citation and punctuation omitted.) *Conner v. State*, 251 Ga. 113, 123 (6) (303 SE2d 266) (1983). See *Scott v. State*, 290 Ga. 883, 885 (2) (725 SE2d 305) (2012) ("A closing argument is to be judged in the context in which it is made."). Finally, we completely reject Brookins's suggestion that the prosecutor's arguments "led [the jurors] to believe that the responsibility for determining the appropriateness" of a death sentence "rest[ed] elsewhere" other than on them, as nothing in the prosecutor's arguments suggested that the final determination as to sentencing for the murders would be made by anyone but the jurors. *Caldwell v. Mississippi*, 472 U. S. 320, 323, 328-329 (III) (A) (105 SCt 2633, 86 LE2d 231) (1985) (vacating a death sentence where "the sentencing jury [was] led to believe that responsibility for determining the appropriateness of a death sentence rest[ed] not with the jury but with the appellate court").

(b) While the prosecutor should not have expressed his own estimate of the cost of such treatment, the prosecutor was arguing properly when he explained, based on the voluminous medical records in the case, that Brookins had not been deprived of appropriate services that might have helped him avoid becoming a double murderer. Cf. *Conner*, 251 Ga. at 123 (6) (holding that "counsel should not go outside the facts appearing in the case" (citation and punctuation omitted)). As to the estimate of cost given by the prosecutor, we conclude that it was not so harmful as to alter our concluding analysis below in subdivision (e).

(c) The prosecutor did not argue improperly by highlighting the evidence of Brookins's prior bad behavior in jail and in prison in support of his argument that Brookins would be a "lousy inmate." Cf. *Henry v. State*, 278 Ga. 617, 620 (1) (604 SE2d 826) (2004) (holding that an argument that a life sentence for the defendant "would be a death sentence for a future prison guard" was improper where there was "no evidence" to support the argument other than the sheer fact of the murder conviction in the case).

66

(d) After referring to Brookins's "reading from the scriptures" in his own testimony in the sentencing phase, the prosecutor quoted from the Bible as follows: "[T]he law is not made for the righteous man, but for the lawless and disobedient, for the ungodly [and for] sinners, for the unholy [and] profane, for the murderers of fathers and the murderers of mothers, for manslayers." The prosecutor then asked the jury to render a death sentence for Brookins, "who is nothing but pure damn evil, who murdered the mother and who murdered the child." While we have held that attorneys may "allude to such principles of divine law relating to [the] transactions of men as may be appropriate to the case," (citation and punctuation omitted) *Hill v. State*, 263 Ga. 37, 45-46 (19) (427 SE2d 770) (1993), we have also held that it is impermissible for a prosecutor to argue that the Bible requires a death sentence for murder, because "[l]anguage of command and obligation from a source other than Georgia law should not be presented to a jury," *Carruthers v. State*, 272 Ga. 306, 310 (2) (528 SE2d 217) (2000), overruled on other grounds by *Vergara v. State*, 283 Ga. 175, 177 (1) (657 SE2d 863)

67

(2008). We conclude that the argument here would not have been outside the discretion of the trial court to allow upon an objection, and thus we also conclude that there is no reversible error here where no objection was ever raised. See *King*, 273 Ga. at 275 (35) ("In light of this difficulty [in drawing precise lines about religious references], some discretion must be afforded to trial courts in determining whether a particular argument, whether made by the State or by a defendant, tends to urge jurors' compliance with some religious mandate in potential exclusion of their duty to consider all applicable sentencing alternatives.").

(e) Finally, we note that none of the closing arguments challenged here by Brookins were objected to at trial and that those challenges have been waived for the purpose of ordinary appellate review. See *Martin*, 298 Ga. at 278-279 (6) (d). However, we have considered the above discussion in our Sentence Review below. See id. at 279 (6) (d) ("That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence.").

68

*Sentence Review*

22. Upon our review of the entire record, including those portions relevant to the arguments noted above that were waived for the purposes of ordinary appellate review, we conclude that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1). See also *Martin*, 298 Ga. at 279 (6) (d) (stating regarding this Court's review under OCGA § 17-10-35 (c) (1): "That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence.").

23. In its sentencing verdict, the jury found as statutory aggravating circumstances that the murder of Suzanne Brookins was committed while Brookins was engaged in the capital felony of the murder of Samantha Giles, that the murder of Samantha Giles was committed while Brookins was engaged in the capital felony of the murder of Suzanne Brookins, and that the murder of Samantha Giles was outrageously or wantonly vile, horrible, or inhuman in

69

that it involved depravity of mind. See OCGA § 17-10-30 (b) (2), (7). Upon our review of the record, we conclude that the evidence presented at Brookins's trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt the existence of these statutory aggravating circumstances. See *Ring*, 536 U. S. 584, passim; *Jackson*, 443 U. S. at 319 (III) (B); OCGA § 17-10-35 (c) (2) (requiring a review of the statutory aggravating circumstances found by the jury); UAP Rule IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence). Even applying what this Court has previously described as a "rule" against "mutually supporting aggravating circumstances," both death sentences in this case remain supported by one statutory aggravating circumstance. See *Tate v. State*, 287 Ga. 364, 368 (7) (695 SE2d 591) (2010) (citing *Zant v. Stephens*, 462 U. S. 862 (103 SCt 2733, 77 LE2d 235) (1983)). We also conclude that the evidence sufficiently supports the jury's finding of depravity of mind under constitutional standards. See *West v. State*, 252 Ga. 156, 161-162 (Appendix) (313 SE2d 67) (1984)

70

(supplying a pattern jury charge to limit the application of the term "depravity of mind" in OCGA § 17-10-30 (b) (7)).

24. The Georgia Code requires this Court, in the direct appeal of a death sentence, to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." OCGA § 17-10-35 (c) (3). Upon our review of the evidence presented in both phases of Brookins's trial, including the evidence regarding his alleged intellectual disability and mental illness, we conclude that the death sentences imposed for the murders in this case are not disproportionate punishments within the meaning of Georgia law. See id.; *Gissendaner v. State*, 272 Ga. 704, 716-717 (19) (a) (532 SE2d 677) (2000) (holding that this Court's statutorily mandated proportionality review concerns whether a particular death sentence "is excessive per se" or is "substantially out of line"). The cases cited in the Appendix support this conclusion, as each shows a jury's willingness to impose a death sentence for the commission of a murder involving the section (b) (7) statutory aggravating

71

circumstance or the deliberate, unprovoked killing of two or more persons. See OCGA § 17-10-35 (e); *Davis v. Turpin*, 273 Ga. 244, 246 (2) (539 SE2d 129) (2000) ("Because it is a jury's reaction to the evidence before it that concerns this Court in its proportionality review, it is irrelevant if the sentences in the cases used for comparison were already at the time, or later are, reversed for reasons unrelated to the juries' reactions to the evidence.").

*Judgment affirmed. All the Justices concur.*

### APPENDIX

*Young v. State*, 312 Ga. 71 (860 SE2d 746) (2021); *Willis v. State*, 304 Ga. 686 (820 SE2d 640) (2018); *Martin v. State*, 298 Ga. 259 (779 SE2d 342) (2015), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018); *Hulett v. State*, 296 Ga. 49 (766 SE2d 1) (2014); *Rice v. State*, 292 Ga. 191 (733 SE2d 755) (2012), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 23 (Appendix) (838 SE2d 808) (2020), and disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3; *Tate v. State*, 287 Ga. 364 (695 SE2d 591) (2010); *Humphreys v. State*, 287 Ga. 63 (694 SE2d 316) (2010), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3; *Stinski v. State*, 286 Ga. 839 (691 SE2d 854) (2010); *Arrington v. State*, 286 Ga. 335 (687 SE2d 438) (2009); *O'Kelley v. State*, 284 Ga. 758 (670 SE2d 388) (2008); *Lewis v. State*, 277 Ga. 534 (592 SE2d 405) (2004) (relevant to Brookins's case despite the fact that the death sentence was later vacated for reasons unrelated to the jury's reaction to the evidence before it, see *Hall v. Lewis*, 286 Ga. 767, 767-768, 781 (II) (692 SE2d 580) (2010));

*Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3; *Lucas v. State*, 274 Ga. 640 (555 SE2d 440) (2001); *Rhode v. State*, 274 Ga. 377 (552 SE2d 855) (2001); *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000); *Palmer v. State*, 271 Ga. 234 (517 SE2d 502) (1999) (relevant to Brookins's case despite the fact that the death sentences were later vacated for reasons unrelated to the jury's reaction to the evidence before it, see *Schofield v. Palmer*, 279 Ga. 848, 852-853 (3) (621 SE2d 726) (2005)); *McMichen v. State*, 265 Ga. 598 (458 SE2d 833) (1995); *Hightower v. State*, 259 Ga. 770 (386 SE2d 509) (1989); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987).

Decided October 4, 2022 — Reconsideration denied November 2, 2022.

Murder. Baldwin Superior Court. Before Judge Wingfield.

*Josh D. Moore, Thea A. Delage, Michael B. Admirand, Katherine L. Moss*, for appellant.

*T. Wright Barksdale III, District Attorney, Sydney E. Segers, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Sabrina D. Graham, Senior Assistant Attorneys General, Matthew B. Crowder, Assistant Attorney General*, for appellee.